MICHAEL AARON et al., *Appellees*, v. THE MISSOURI & KANSAS TELEPHONE COMPANY et al. (THE MISSOURI & KANSAS TELEPHONE COMPANY, *Appellant*).

No. 17,890.

SYLLABUS BY THE COURT.

1. TELEPHONE COMPANY—*Negligence—Defective Poles—Liability to Employee of Other Company.* One telephone company which sells to another the right to maintain a wire upon its poles is liable for an injury to an employee of the other company, who is himself free from fault, which is occasioned by the failure of the owning company to use reasonable diligence to keep the poles in such condition that they can be used with safety in the customary manner.

2. ———— *Same.* In that situation, where the owning company for the purpose of installing a new set of poles has stripped its wires from the old ones, and an employee of the other company is killed while removing the remaining wire, by the breaking of a pole caused by a weakness not discoverable by mere observation, it is not necessarily relieved from liability by the fact that it was engaged in replacing the old poles.

3. ———— *Same.* In that situation a general warning to the

workman to be careful while removing the wires is not neces-sarily sufficient to relieve the owning company from further responsibility.

4. ——— *Same.* In that situation the owning company is not as a matter of law exempt from liability on the ground that the workman was bound at his peril to ascertain the condition of the pole before climbing it.

5. VERDICT—*Excessive—Judgment Modified.* Under the evidence an allowance of $10,000 to the parents for the death of their son is held to have been excessive.

Appeal from Leavenworth district court. Opinion filed April 12, 1913. Modified.

*J. W. Gleed, J. L. Hunt,* and *D. E. Palmer,* all of Topeka, for the appellant.

*John T. O'Keefe, Lee Bond,* and *M. N. McNaughton,* all of Leavenworth, for the appellees.

The opinion of the court was delivered by

MASON, J.: A partnership which was conducting a local telephone business attached a wire to a line of poles of the Missouri and Kansas Telephone Company, under a contract allowing this to be done for an agreed consideration. The owner of the poles, which will be spoken of as the telephone company, was engaged in replacing them by a new set. For this purpose it had a crew of men at work removing from the old poles all of its own wires excepting one, which was described as a "dead" wire. Walter Aaron, in the employ of the partnership referred to, was following this crew and removing the two remaining wires. For this purpose he climbed a pole from which all but these two wires had been removed. He took one off, and as he loosened the other the pole fell with him, inflicting injuries from which he died. His parents sued the telephone company, alleging its negligence to have been the cause of his death. They recovered a judgment and the defendant appeals.

The defendant maintains that there was no evidence of any negligent act or omission on its part that could have been the proximate cause of the injury. The injured workman was not its employee, and its liability can not be based upon principles peculiar to the relation of master and servant. The plaintiffs contend that the injury resulted from the neglect of two duties which the telephone company owed to the local telephone company and its employees: to keep the poles in such condition that it was safe to climb them for any purpose connected with the maintenance of the telephone wire of the partnership; and if any of them were in such condition as to make this unsafe, to give a sufficient warning of that fact. The telephone company, in selling the privilege of attaching a wire to its poles, by fair implication assumed an obligation to use reasonable diligence to keep them in such condition that they could be used with safety in the customary manner; and this obligation inured to the benefit of the employees of the local company. The company owning the poles necessarily knew that the employees of the other company would make use of the poles, and in legal contemplation invited them to do so; it is not absolved from liability by the want of contractual relation with them. The case is within the principle thus stated:

"One who supplies a thing for such use by others that it is obvious that any defect will be likely to result in injury to those so using it is liable to any person who, using it properly for the purpose for which it is supplied, is injured by its defective condition. The doctrine of invitation has been invoked as a ground of liability in such cases, proceeding upon the theory that he who furnishes a thing for a certain use by others invites others to use it, and is therefore bound to make it safe for such purpose." (29 Cyc. 484.)

In a celebrated case involving the basis of non-contractual liability for negligence, Sir William Baliot Brett, Master of the Rolls, deduced from the prior de-

cisions a comprehensive principle which he expressed in this language:

"Whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger." (*Heaven v. Pender*, L. R. 11 Q. B. Div. 503, 509.)

This generalization has met with judicial approval in this country as well as in England. (*Huber v. The La Crosse City R. Co.*, 92 Wis. 636, 66 N. W. 708, 53 Am. St. Rep. 940, 31 L. R. A. 583. See, also, Note, 46 L. R. A. 41, 109; 1 Thompson's Commentaries on the Law of Negligence, § 979; 2 Cooley on Torts, 3d ed., p. 1491.) The facts of the case are unusual, and we find no precise parallel in the decisions, but the circumstance that the telephone company remained in full control of the poles is a sufficient basis for establishing a noncontractual liability. Of this phase of the matter it has been said:

"No question has ever been raised as to the propriety of the rule that, provided the plaintiff has a right to be where he was at the time he was injured, the fact that the defendant or his servants had control of the injurious agency is a sufficient ground for requiring him to indemnify the plaintiff independently of the questions whether there was or was not any privity of contract between them, and whether the injurious agency was real or personal property." (Note, 46 L. R. A. 38.)

Such a liability is measured by the same standard as that of an employer to his employee. The cases cited bear out this statement of the same note:

"Whether the person who owns or supplies the agency which caused the injury occupies the position of master, or is a mere stranger, as respects the servant injured, the duty incumbent on him must necessarily

be measured by the standard of 'ordinary care,' and neither on principle or authority is there any reasonable ground for arguing that this expression can have a different meaning in cases involving an exposure of the servant to exactly the same perils, simply because the party who subjects him to those perils is not his master." (Note, 46 L. R. A. 52.)

If no change of poles had been in progress and a pole had broken while Walter Aaron was climbing it to attach or repair the wire, causing him to fall, he being without fault in the matter, liability of the company could be based upon its negligence in permitting the pole to become defective. But the defendant argues that there could be no liability here for allowing the pole to become weakened, because the telephone company was in the act of putting in a line of new poles, a course adapted to remedy any existing defect. The reason for the substitution of new poles was not shown. It does not affirmatively appear that it was because the old poles were worn out, or were regarded as unsafe. In any event, the process of substitution involved the climbing of the old poles for the purpose of detaching the wires. If the telephone company, after having stripped the old poles of its own wires (excepting the one described as "dead"), ought reasonably to have expected that some employee of the local company, in the course of the removal of the other wire, might be injured by climbing a pole which was unsafe for that purpose because of a weakness not apparent, but discoverable by methods in ordinary use, it was bound to use reasonable diligence to prevent this, and if it neglected to do so it was liable for any injury resulting from such omission. We think each of these hypotheses had support in the evidence and therefore that the question of liability was rightfully submitted to the jury. It was shown that the pole that fell broke off at the surface of the ground; that it was hollow, but its outside appearance gave no indication of this fact. A

Aaron v. Telephone Co.

witness who had been in the service of the telephone company for eighteen years testified that the customary method of ascertaining whether a pole had become unsafe was by thrusting a sharp crowbar into the portion below the ground, or by pressing against it with a long pole having a sharpened iron at the end; that the practice was for the safety of the poles to be tested and the unsafe ones marked, before the workmen undertook to strip the wires from a line of poles. The wires themselves might help to support a weak pole, and whatever danger there was in climbing it would naturally be increased by their removal. The employees of the telephone company may have been perfectly safe in the work they were doing, and yet the situation may have required some such precaution as that suggested, for the benefit of whatever person should remove the last wire. The jury found that an employee of the defendant had warned the president of the local company in a general way to be careful while removing the wires, and he had repeated the warning to Walter Aaron, nothing being said in either case about this particular pole. This can not be held as a matter of law to have been sufficient to absolve the telephone company from further responsibility.

The defendant further maintains that the evidence conclusively established that the injured workman was guilty of contributory negligence, because reasonable care for his own safety required him to examine into the condition of the pole before climbing it, and such examination would have shown it to be dangerous. The right of a "lineman" to recover for injuries resulting from a defect in the pole on which he is working has been affirmed and denied. (Note, 15 A. & E. Ann. Cas. 598; Note, Ann. Cas. 1912B, 467; Note, 21 L. R. A., n. s., 774; Notes, 26 L. R. A., n. s., 509, 1195; Note, 30 L. R. A., n. s., 477.) In each of the cases to which the two notes last cited are appended the injured workman was employed by a company other than that owning the

poles, but as he sued his own employer no point was developed having on that account any special application here. There can be no hard-and-fast rule that any workman whose duties require him to climb a telephone pole must judge of its condition at his peril. Here there was positive evidence of a custom to have an inspection made by some one else. At the time of his death Walter Aaron was nineteen years old and had been working for the local telephone company two or three weeks. He was not shown to have had any other experience. The question whether his conduct precluded a recovery was for the jury.

A number of trial rulings are complained of. A witness was allowed to be asked whose duty it was to inspect the poles, and other similar questions. The form was objectionable, but no prejudice resulted, for his answers as a whole showed plainly that what he was undertaking to do was to describe the usual practice as he had observed it. An objection is made to an instruction because it seemed to allow the jury to determine what the defendant's duty was. In effect, however, the court instructed that it was the duty of the defendant to use reasonable precautions, and left the jury to determine whether certain conduct was necessary to that end, and therefore became its duty. The jury were told that it was the duty of the defendant to keep the poles in a reasonably safe condition. A more accurate statement would have been that its duty was to use reasonable diligence to make them safe, but the failure to observe the distinction does not warrant a reversal, for upon the whole charge it does not appear that any misconception on the part of the jury was probable. (*Kamera v. Boiler Works*, 82 Kan. 432, 108 Pac. 806.) An instruction was given to the effect that the company was liable if the injury resulted, without fault of the person injured, by reason of a hidden defect of which the defendant knew, or would have known if it had exercised reasonable diligence. If the

defendant actually knew of the defect its liability would depend upon whether it used due care to warn the workman, but that aspect of the matter is made sufficiently clear elsewhere in the charge. An instruction that ordinary care on the part of the injured person may be inferred from the instinct of self-preservation is criticised on the ground that it should have been limited by the phrase "in the absence of evidence to the contrary." The language used does not suggest that the inference referred to would necessarily overcome positive evidence, but properly leaves the matter to the jury. The contention is made that several of the special findings were without support in the evidence. The jury found in answer to questions that Walter Aaron was completing the work of the gang ahead of him; that he was working indirectly for the defendant, under the defendant's foreman. There was a sense in which these answers were justified. The evidence showed that Aaron was removing the dead wire owned by the telephone company, but left on the poles by its foreman. The defendant introduced no evidence whatever, and the presence of this wire is not explained. There was room for the inference that the defendant was interested in having it removed before the poles were taken down, and therefore that to that extent Aaron was doing work for its benefit. In any event no prejudice resulted, for the judgment was not based on the theory that he was in its employ. The jury also said there was no direct evidence whether Aaron inspected the pole before climbing it. Several witnesses testified that they did not see him do so, although he was within their sight. The evidence was far from conclusive, and might well be characterized as not direct. The finding as to the grounds of negligence is not clearly expressed, but we interpret it as meaning that the defendant was negligent in using an unsafe pole and in failing to give warning of its condition.

13—89 KAN.

The defendant maintains that the amount of recovery allowed—$10,000—was too large. Under our statute the damages must be estimated solely upon the basis of compensation for pecuniary loss. (*A. T. & S. F. Rld. Co. v. Brown, Adm'r,* 26 Kan. 443; *Railway Co. v. Ryan,* 62 Kan. 682, 64 Pac. 603.) The parents were entitled to recover what their son would probably have earned during his minority, less the probable expense of his maintenance, and in addition thereto such sum as he would have been likely to contribute to their support, or to the support of either, after he became of age. (*Railroad Co. v. Cross,* 58 Kan. 424, 49 Pac. 599.) The deceased was the oldest of six children. Nothing is shown as to his parents' financial circumstances beyond the fact that they owned their home. The father was township assessor. He was at the time of the trial 54 years of age, his wife being 44. Walter at the time of his death was receiving "possibly" $1.50 or $1.75 a day. He had at one time been deputy township assessor, receiving $3 a day. His mother testified that during this time the money was kept for him, he buying what he wanted as he needed it—high-school books and clothing, and that she received a part of it. There was no further testimony regarding the disposal of his wages or his contribution to the support of the family. This was substantially all the evidence that bore upon the extent of the plaintiff's pecuniary loss. We think it failed to justify so large an award. What rate of interest the amount allowed should be regarded as capable of earning is debatable. An annuity payable jointly to a husband of 54 and a wife of 44 until the death of one of them, and thereafter for life to the survivor, can be purchased at the rate of $1973.30 for each $100. Ten thousand dollars would therefore be more than enough to secure to the plaintiffs the payment of $500 a year for so long as either should live. At the time of the death of their son they were aged respectively 50 and

40, and such an annuity would have cost them $2099.70 for each $100. While the amount that their son would probably have contributed to their support if he had lived is not capable of exact computation, it seems clear that there was no basis in the evidence for expecting that his annual contribution would reach anything like so high an average as $500. In determining what allowance should be deemed excessive little aid is to be had from the adjudications, for each case turns upon its peculiar facts. In this state recoveries by parents for the death of a child have been sustained where they amounted to $4000 (*Railway Co. v. Fajardo,* 74 Kan. 314, 86 Pac. 301, 6 L. R. A. 621) and $4500 (*St. L. & S. F. Rly. Co. v. French,* 56 Kan. 584, 44 Pac. 12) and set aside as excessive where they amounted to $3000 (*A. T. & S. F. Rld. Co. v. Brown, Adm'r,* 26 Kan. 443) and $1500 (*Coal Co. v. Limb,* 47 Kan. 469, 22 Pac. 181). A mere comparison of the amount of the judgment with that sustained or set aside in other cases is obviously of little value, especially with respect to decisions in other jurisdictions, where the measure of recovery is different. Cases are collected in notes in 12 Am. St. Rep. 381, 70 Am. St. Rep. 669, and 18 A. & E. Ann. Cas. 1209. See, also, 4 Sedgwick on Damages, 9th ed., § 1367, and 1 White on Personal Injuries on Railroads, § 206.

We are of the opinion that the judgment is excessive, but not so much so as to suggest the influence of passion or prejudice. (*Argentine v. Bender,* 71 Kan. 422, 80 Pac. 935.) Upon a careful consideration we have concluded that $6000 is as large a judgment as should be permitted to stand under the evidence. The judgment will be reduced to $6000, and as so modified, affirmed, subject to the right of the plaintiffs to require a new trial upon the question of the amount of damages sustained, by filing with the clerk of the district court a request therefor within twenty days after the mandate of this court shall have been issued.