No. 20,779.

MRS. MAUDE GRIFFITH, as Administratrix, etc., *Appellee*, v.
THE MIDLAND VALLEY RAILROAD COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

1. EMPLOYERS' LIABILITY ACT—*Death of Employee—Action for Damages
—Action Not Removable to Federal Court*. An action for damages
against a railway company engaged in interstate commerce for the
wrongful death of a workman employed in that commerce, which is
sought to be maintained by the deceased workman's administratrix
for the benefit of his widow and infant children, is not removable as
a matter of law merely because the petition does not contain a spe-
cific allegation that the widow and children are dependent upon the
deceased workman for their support, when the petition otherwise
clearly discloses that the action is sought to be maintained under the
federal employers' liability act, and clearly discloses that the recovery
for damages is not demanded under state law.

2. SAME—*Trial—Demurrer to Evidence Properly Overruled*. Evidence
to support a cause of action against an employer for the wrongful
death of its workman examined, and held that a demurrer thereto was
properly overruled.

3. SAME—*Trial—Proper Impeaching Testimony*. Certain impeaching
testimony examined, and held to be relevant to the issues, pertinent
to the antecedent testimony sought to be impeached, not collateral,
properly restricted to purposes of impeachment, and admissible.

4. SAME—*Trial—Instructions*. It is not error to refuse an instruction
limiting the scope and purpose of certain evidence admitted, when it
is requested as one of thirty instructions handed up to the court at
the conclusion of the evidence, and when the court, at the time of the
introduction of the evidence, explained to the jury the purpose of the
evidence and limited its application thereto.

5. SAME—*Trial—Admission of Deposition Not Error*. It is not preju-
dicial error to admit in evidence a deposition of a resident of the
county, whose usual employment is outside the state, when the depo-
sition contains the cross-examination of the deponent, when both
plaintiff and defendant had caused the issue and service of subpœnas
for his personal attendance as a witness without avail, when an at-
tachment for the deponent had been issued and a *bona fide* effort had
been made to serve it, and when the trial court made a finding that
both plaintiff and defendant had used their best efforts to procure
his attendance, and that the deponent was either absent from the
jurisdiction or that the sheriff could not find him in time to secure his
personal testimony.

6. SAME—*Trial—Evidence.* Other matters of evidence examined, and held admissible.

7. SAME—*Trial—Refused Instructions.* Examination of a refused instruction, and held the subject sufficiently and favorably covered by instructions given.

8. SAME—*Trial—Instructions.* Instruction touching matters to be taken into account in estimating damages under the federal employers' liability act considered, and held within the fair intendment of the act, and in harmony with pertinent, authoritative precedents pertaining thereto.

9. SAME—*Verdict—Not Excessive.* Verdict and award of damages considered, and held not excessive under the circumstances.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed May 12, 1917. Affirmed.

C. *Ward Wright, Albert Faulconer,* both of Arkansas City, and O. *E. Swan,* of Muskogee, Okla., for the appellant.

W. *L. Cunningham,* and C. *T. Atkinson,* both of Arkansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff is the administratrix of the estate of Elmer E. Griffith, who met his death while engaged as a bridge carpenter in the service of the defendant railway company, near Grainola, Oklahoma.

Plaintiff's original petition alleged that she brought the action for the benefit of the surviving widow and two minor children of the deceased, and that the defendant was engaged in interstate commerce, and recited the incidents which brought about the death of Griffith while he was repairing one of the defendant's railway bridges devoted to interstate commerce. The repairs were being made with second-hand timbers. It was alleged:

"That it was the further duty of said defendant company, and it was its custom, and the custom of all railroad companies, as was well known to said Elmer E. Griffith and defendant, to carefully inspect all used timbers which were to be again handled and used by any of its employees to see that all protruding spikes and nails were removed therefrom, so as not to endanger the life or limb, or injure any employee who was required to handle them; that if defendant had made said inspection of the timbers hereinafter mentioned, and removed all protruding spikes

and nails, the injury and damage hereinafter complained of would not have happened.

. . . . . . . . . . . . . . .

"That it was the further duty of said defendant company to notify its employees of the presence of any spikes or nails in said pieces of timber, and to warn them of the danger thereof, by said spikes or nails catching in the clothing of said employees, and that if said defendant company had notified or warned said Elmer E. Griffith of the spikes and nails in said pieces of timber, and of the danger to him therefrom, the injury and damage hereinafter complained of would not have happened.

"That said defendant company, not regarding its duty in that behalf, . . . and failing, neglecting and refusing to warn or notify the said Elmer E. Griffith of the presence of protruding spikes or nails in said timbers, and of the danger of the same catching in his clothing and jerking him from said bridge and *tressel*, on the said 26th day of September, 1913, while the said Elmer E. Griffith was in the employ of said defendant company, and engaged in the afore-mentioned repair of said bridge and *tressel*, the said defendant company ordered and directed him, the said Elmer E. Griffith, to unload a push car loaded with the aforementioned used timbers, and to throw the said timbers from the bridge and *tressel* to the ground beneath. That most of said pieces of timber were about a foot square at each end and from 2 to 4 feet long and weighed about 200 pounds. That at said time' while the said Elmer E. Griffith was carrying one of said large pieces of timber from the push car to the edge of the bridge or *tressel* to drop it to the ground beneath, which by reason of its size and weight he was carrying in his arms up against his body, a nail in said piece of timber, unknown to him, caught in the 'bib' of his overalls, and as he dropped it over the edge of said bridge or *tressel*, jerked him from said bridge and *tressel* to the ground beneath, where he struck on his head and shoulders, almost instantly killing him.

"That said Elmer E. Griffith was wholly without fault or negligence, and did not know, and could not by the exercise of reasonable care have known that said nail was in said piece of timber, or of its danger to him, and believed that said defendant had done its duty inspecting said pieces of timber and removing from it all protruding nails and spikes.

"Wherefore, plaintiff prays judgment against the defendant in the sum of $25,000.00 for the benefit of said surviving widow and said surviving children of the said Elmer E. Griffith, and for costs and for all proper relief."

The defendant filed a petition for an order to remove the cause to the federal court on the grounds of diversity of citizenship, and that the matter in dispute exceeded $3000. This was denied.

An amended petition was filed by plaintiff which recited sub-

Griffith v. Railroad Co.

stantially the same facts pleaded in her original petition, but with some greater detail, and including the following:.

"16. That at the time of his death his widow was of the age of 26 years and had an expectancy of 38 years; that said two minor sons were respectively two and four years old, and that said .widow and children were dependent upon said Elmer E. Griffith for their support and maintenance."

Defendant moved to strike this amended petition from the files. This motion being overruled, an answer was filed which contained a general denial, pleaded Griffith's contributory negligence and assumption of risk, rehearsed defendant's prior petition for removal of the cause to the federal court and that it was a proper cause for removal, and that the state court had no jurisdiction. In an amended answer, defendant pleaded that it was engaged in interstate commerce and "that at the time of the injury and death of the said Elmer E. Griffith he was employed by the defendant in connection with the repairs of its bridge used by it in the transportation of such interstate commerce."

The jury returned a verdict for $15,000, divided as follows: For Griffith's widow, $4000; and for his two children, $5250 and $5750, respectively.

Defendant appeals, setting up forty-three errors in an assignment which covers some seventeen pages of its abstract. Such of these as are worthy of comment will be noted in the order of their presentation.

It is first contended that the trial court erred in denying the petition for removal. Perhaps the first petition was defective in not pleading clearly and specifically the dependency of the widow and children upon the dead workman. But conceding that, the petition clearly showed that the action was sought to be maintained for their benefit under the federal employers' liability act (Part 1, 35 U. S. Stat. at L., ch. 149, p. 65), and as clearly showed that it was not brought under state law. (Gen. Stat. 1915, § 7323.) The pertinent part of the federal statute under which the petition for removal was denied reads:

". . . And no case arising under this Act and brought in any state court of competent jurisdiction shall be removed to any court of the United States." (Part 1, 36 U. S. Stat. at L., ch. 143, p. 291; *Second Employers' Liability Cases*, 223 U. S. 1; *Mo., Kan. & Tex. Ry., v. Wulf*, 226 U. S. 570; *Seaboard A. L. R. Co. v. Norton*, 233 U. S. 492.)

It has often been held that where on account of the obscurities and imperfections of pleading the cause of action does not disclose in the first instance that it is removable, it may be removed when that feature of the action is sufficiently ascertained. It ought likewise to be true that when a petition, notwithstanding its imperfect pleading, discloses that it attempts to plead a nonremovable cause and none other, the petition for a removal should be denied.

In *Seaboard Air Line v. Renn*, 241 U. S. 290, which was an action under the federal employers' liability act of 1908, and where the pleading was defective, it was held the trial court did not err in treating the original complaint as pointing, although only imperfectly, to a cause of action under the law of congress.

It must be held that no error was committed in denying the petition for removal.

The next contention is that the demurrer to the evidence should have been sustained, and that the jury should have been instructed to return a verdict for the defendant. This would have been a gross infringement of the functions of the jury. Neither the trial court nor this court can invade the jury's province, and our only care is to see that there is sufficient competent evidence to justify the jury's determination of the facts, nor have we any concern that there may have been contradictory evidence which, if believed by the jury, would have warranted a contrary verdict. Very briefly recounting the evidence to support the court's rulings complained of under this assignment, there was testimony tending to show that it was customary to remove all spikes and nails from used timbers before devoting them to bridge work or bridge repairs a second time; that it was an invariable custom to do so, and not safe to use the timbers until that was attended to. It was also shown that when the deceased had picked up the timber in his arms—a block twelve inches square and about two feet or two and a half feet long, and weighing from eighty to one hundred pounds—and undertook to throw it over the side of the bridge, he appeared to be jerked, there was a sound as of cloth tearing, and when he was picked up the "bib" of his overalls was torn as by a nail or spike, that the overalls were strong and nearly new, that the tear was recent and began

near the top of the "bib" and extended downward and then out to one side, and tended to prove that the tearing was the result of some such mishap as alleged by plaintiff. Such a log or timber as the deceased had thrown from the bridge, and which might have jerked him along with it, was found near where he fell, and it contained a projecting spike in it. These facts and circumstances all tended to show how Griffith met his death, and tended likewise to show that the defendant had been negligent in not having this particular block cleaned of spikes before its reuse, and that its inspection before reuse had been negligent. On such a showing of the facts and circumstances attending Griffith's death, it would have been improper for the trial court to have disposed of the case summarily on a demurrer to the evidence or on an instructed verdict.

Error is earnestly urged in the admission of testimony which tended to impeach the evidence of Steele and Clayton, the foreman and assistant foreman of the bridge gang, who were witnesses for the defendant. Two incidents will sufficiently develop the significance of the testimony objected to.

Clayton had testified that he had examined the log or block thrown by Griffith and that there was no spike in it. He admitted that possibly he might have pointed out the log to Sturtevant, a witness for the plaintiff. He denied that Sturtevant had turned the log over and had called his attention to the projecting spike which probably had caught in Griffith's clothing and had jerked him to his death. Sturtevant's impeaching testimony in part reads:

"Q. You testified yesterday about going down under the bridge to see the log that Griffith had thrown off? A. Yes, sir.

"Q. Who went with you? A. Dr. Burson and Mr. Clayton.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. When you tipped that log over down there, as you testified about yesterday, did you say anything to Mr. Clayton about it? . . . A. . . . I simply said this when I turned this block over and discovered this nail about three or four inches from the end of it. . . . I simply told them that the nail was probably what caught in his pants and jerked him off.

"Q. Did you say that loud enough for them to hear? A. Yes, they heard it. Because they were not standing more than three or four feet from me."

Steele had testified that *he* had cut or torn the "bib" of Griffith's overalls while removing the clothing of the dying Griffith. To impeach Steele's testimony, the plaintiff produced Mansfield, uncle of the deceased, who testified that Steele told him that the doctor had torn the clothing. A brother of the dead man testified to the same effect:

"Q. What, if anything, was said by Steele as to how they come to be torn there at the bib? A. He said the doctor tore them."

There was a good deal more of this sort of testimony, all of which tended more or less to impeach and discredit the defendant's witnesses by showing that the testimony they had given was inconsistent with their prior statements on matters not merely collateral but relevant to the vital issues in the case. The trial court restricted the scope of the impeaching evidence to the purpose of its introduction, and as such its admission did not offend against any rule of evidence. (40 Cyc. 2557, 2590, and citations in note on page 2701.)

Complaint is made of the trial court's refusal to give an instruction that certain evidence was only to be considered for purposes of impeachment, and error is based thereon, but we note that the matter was fully explained to the jury at the time of its introduction. The trial court ruled:

"Any statement of . . . [the witness] made after the accident would be incompetent as a matter in chief to establish a case, but it wouldn't be incompetent as affecting the credibility of a witness. It seems to me as a matter of impeachment it is proper.

. . . . . . . . . . . . . . .

"As to these matters that happened right after the accident I think this goes to affect the credibility of the witness. I think it is a matter of the impeachment of this witness. I think the jury has a right to consider whether or not the witness made a different statement at that time. On that theory it will be overruled."

Such a ruling given at the time would be more likely to instruct the jury as to the limited scope and purpose of the evidence than the instruction requested merely as one of the thirty separate instructions prepared by the defendant and handed up to the court when the evidence was concluded.

Another error urged was in the introduction of the deposition of George Hudgens. This deposition was taken some eighteen days before the trial and filed five days before the trial. The deponent's direct testimony was short; his cross-

Griffith v. Railroad Co.

examination by the defendant was lengthy. Both parties de-
sired the presence of the deponent as a witness and both had
caused him to be subpœnaed. He did not appear. The de-
fendant caused an attachment to issue, but he could not be
found. After exhausting the court's processes to secure the
presence of the witness would avail, the court made the follow-
ing finding:

"It is admitted by both plaintiff and defendant that George Hudgens
was a witness desired by both parties, and that both parties had him sub-
pœnaed. That he is a resident of Cowley County, Kansas, but that he is
employed mostly in Oklahoma. That some time prior to the trial the
plaintiff took his deposition and was cross-examined by the defendant.
That the defendant at the time of the subpœna tendered him fees for a
day's attendance. Since that time the witness had disregarded the sub-
pœna of both the plaintiff and defendant. That the sheriff pending this
trial has made an effort to find the witness and he can not find such wit-
ness. He has just called the home of the witness at Arkansas City and
was informed by the wife of the witness that he left home some three
days ago; further than that she does not know or have the least idea in
the world where the witness can be found. The defendant has caused to
be issued out of the office of the clerk of this court an attachment for
said witness, which said attachment is now in the hands of the sheriff,
and that the sheriff had made a return of the attachment showing that
the witness can not be found in Arkansas City. The court being of the
opinion that both parties have used their best efforts to get the witness
here, and that his deposition is on file, that he is either out of the juris-
diction of this court, or that the return of the sheriff shows that he can
not be found in time to give his testimony in person at this trial, the
court is of the opinion, under the circumstances that the deposition should
be permitted to be offered in evidence."

The civil code (§ 358) provides that when a deposition is
offered to be read in evidence, it must appear to the satisfac-
tion of the court that, for any cause specified in section 337 of
the code, the attendance of the witness can not be procured.
The pertinent part of section 337 authorizes the use of deposi-
tions when the witness is absent from the county. (13 Cyc.
843, 989, 991.)

A trial court's finding on a matter of this sort is governed
by the same principles which control as to all other findings
of fact when they come to an appellate court for review. And
under the circumstances here shown, it can not be said that
there was error or abuse of discretion in permitting the depo-
sition to be read. If, indeed, the witness was only in conceal-

ment to evade the process of the court, the situation was so much like that of his personal absence from the county that it might be dealt, with as such.

No error can be discerned in the introduction of the evidence of the witness who testified that he saw a spike or nail in the block thrown by the deceased. Whether the block was sufficiently identified as the one thrown by Griffith was for the determination of the jury in the light of all the circumstances. Nor was it error to permit proof of the custom of railroads to require second-hand timbers to be carefully inspected and to have all nails and spikes removed therefrom before such timbers were again used. (*Texas & Pacific Ry. Co. v. Behymer,* 189 U. S. 468, 470.)

Defendant next complains of the court's refusal to give certain instructions, relative to the custom of railroads, touching the use of second-hand timbers, and which required all protruding nails and spikes to be removed therefrom prior to the reuse of the timbers, and the exemption of defendant from liability for failure to observe this custom; if Griffith, by ordinary observation, could have ascertained that this custom had not been pursued with reference to the timber handled by him; and that in such a situation Griffith would have no right to rely on this custom of railroads, and the plaintiff could not recover. It seems to us that this phase of the case was sufficiently covered by instructions given by the court, particularly instructions XI, XII, XIII and XIV, which it is needless to quote at length, and under certain decisions of the supreme court of the United States (*Gila Valley Ry. Co. v. Hall,* 232 U. S. 94) they might be criticised as being too favorable to defendant. In the case just cited the supreme court said:

"An employee assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence. But the employee has a right to assume that his employer has exercised proper care with respect to providing a safe place of work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employee with the assumption of a risk attributable to a defect due

to the employer's negligence, it must appear not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person, under the circumstances, would have appreciated it." (p. 101.)

The following instruction is criticised:

"If you find in favor of the plaintiff, then in estimating damages you can not presume that the next of kin have suffered pecuniary loss because of the death of Griffith, but the pecuniary loss, if any has been sustained, must be proven. If you find for the plaintiff, you must allow the plaintiff in your verdict for the use and benefit of herself, as wife, and her minor children, if you find that she has such children, such sum as in your judgment under the proof, will be just compensation for the pecuniary loss they have sustained by reason of the death of said deceased. In estimating such sum, you should consider the age of the deceased, together with his capacity for earning money, his disposition to contribute, to care for, and to furnish his wife with money as shown by the evidence, the ages of the children and the probable expectation of the life of the parties concerned."

The defendant's counsel seize on the language "to contribute, to care for, and to furnish his wife with money," and contend: "In permitting recovery for the wife's loss of care, the instruction is erroneous."

To support this assignment of error the defendant cites *Gulf, Colorado, Etc., Ry. Co. v. McGinnis,* 228 U. S. 173, and *Mich. Cent. R. R. v. Vreeland,* 227 U. S. 59. We have perused these decisions with care; and the instruction given here, read as a whole and without excising the criticised language from its context, does not violate the rule laid down in either of these cases. In the Vreeland case, after the trial court instructed the jury to confine themselves to a proper compensation for the loss of any pecuniary benefit which would reasonably have been derived by the widow from the decedent's earnings, the court added thereto the following:

"In addition to that, independent of what he was receiving from the company, his employer, it is proper to consider the relation that was sustained by Mr. Wisemiller and Mrs. Wisemiller, namely, the relation of husband and wife, and draw upon your experiences as men, and measure, as far as you can, what it would have reasonably been worth to Mrs. Wisemiller in dollars and cents to have had, during their life together, had he lived, the care and advice of Mr. Wisemiller, her husband." (p. 73.)

The quoted part of this instruction was condemned by the supreme court as throwing the door open to the widest speculation. No such vice inheres in the present instruction, and it seems to have been given by the trial court after careful study of *Mich. Cent. R. R. v. Vreeland,* 227 U. S. 59, and *Norfolk & Western Ry. v. Holbrook,* 235 U. S. 625, and it is clearly in accord with the latter, where it was said:

"In the present case there was testimony concerning the personal qualities of the deceased and the interest which he took in his family. It was proper, therefore, to charge that the jury might take into consideration the care, attention, instruction, training, advice, and guidance which the evidence showed he reasonably might have been expected to give his children during their minority, and to include the pecuniary value thereof in the damages assessed. . . . The ascertained circumstances must govern in every case." (p. 629.)

We discern nothing further touching the instructions given and refused which requires discussion.

Defendant's final contention is that the verdict is excessive. The widow received judgment for $4000, the four-year-old child $5250, and the two-year-old child $5750. Defendant makes some interesting computations of income on the investments of these sums based on a rate of six per cent to show that they would produce a greater pecuniary support than the deceased was earning and contributing to his family's support about the time of his death or likely to earn and contribute thereto had he lived. The assumed rate of six per cent on such investments is too high. The ordinary Kansas securities—like our farm mortgages, which are our most familiar class of investments bearing six per cent interest or less—are subject to taxation, and the general average rate of state, county, township, school district and city taxation, not to speak of special taxes, aggregates about two per cent, so the net income on such investments would be nearer four per cent than six per cent. On county or other municipal bonds not taxable, the prevailing rate is from four per cent to five per cent, but the best of these command a substantial premium, and are hard to get hold of. These awards can not be prudently invested so as to yield a net income of much in excess of four per cent. Moreover the proof showed, and indeed it was conceded, that the deceased was an unusually industrious and saving young man of twenty-six years of age, that he usually

earned from $2.50 to $3.50 per day and was almost constantly employed, that practically all his expenditures were devoted to his family, that his financial situation had improved constantly since his marriage, and it was highly probable that his material and financial circumstances would continue to improve. The sum awarded to the widow is decidedly moderate. The awards to the infant sons are greater than to the widow, but it will probably consume both the principal and the income of their awards to bring them to useful manhood, as their father would probably have reared them if he had lived. The total damages awarded are larger than the maximum permitted by the Kansas statute. Congress has left the matter open, subject of course to the good sense of the jury, and subject also to the power of the courts to grant a remittitur or a new trial in case of an excessive verdict. This court on proper occasion does not hesitate to order an award reduced, with the option of a new trial, although the trial court has approved the amount. (*Aaron v. Telephone Co.*, 89 Kan. 186, 195, 131 Pac. 582; *Truman v. Railroad Co.*, 98 Kan. 761, 767, 161 Pac. 587.) Here the total award of $15,000 is a good round sum, but in the light of all the circumstances we would hardly be justified in holding that it is excessive, and the award will have to stand.

The judgment is affirmed.