No. 29,497.

NANNIE D. ELLIS, *Appellee,* v. THE KANSAS CITY PUBLIC SERVICE COMPANY, *Appellant.*

(292 Pac. 939.)

Opinion filed November 8, 1930.

*F. S. Jackson, James E. Smith* and *S. N. Jackson,* all of Topeka, for the appellant.

*James F. Getty,* of Kansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: Plaintiff brought this action for herself and on her husband's behalf to recover damages for injuries which she sustained through the negligence of the defendant corporation and two of its street-car employees in Kansas City.

As plaintiff was alighting from defendant's street car at a scheduled stopping place, the street car was suddenly started, which caused her to be thrown to the pavement and injured.

The severity of that injury was the main question in controversy in this lawsuit. In his opening statement to the jury counsel for the defendant company, with commendable frankness, said:

"We are not expecting to defeat this lawsuit on account of the law of the

case; . . . when you get down to . . . the issues between these parties it will be how much you think is fair and equitably coming to this lady on account of the injuries she has suffered. . . . . There is no use for us to try to defeat that liability. So the only thing that we are unable to agree upon about this lawsuit is how much the damages ought to be, how badly this woman is hurt."

On behalf of plaintiff the evidence tended to show that she was 55 years of age, that for three years prior to the accident she was strong and healthy and weighed from 218 to 225 pounds. When she was thrown from the steps of the street car she suffered so much that she begged the bystanders not to lift her. Her back and the end of her spine were very painful. She was carried to the sidewalk and eventually brought to her home in a small delivery truck. A doctor was called and he found her suffering so much pain that he gave her a hypodermic of morphine. She was confined to her bed for two weeks, after which she could sit up in a chair cushioned with pillows. After the first two weeks, she could walk a little, but had to lie down frequently, and could do no housework for a long time. She had been accustomed to assist her husband in conducting a small greenhouse business, but after her accident she had to employ a woman for a year to do her housework and to work in the hot-house in her stead. As a result of the accident she developed a peculiar affliction whereby the union of the sacrum and coccyx would seem to slip and cause her such intense pain that she would fall to the floor and would have to twist her body around to get the union back to its normal position before she could get up again. This slipping sometimes happened several times in a day and it always left her sore for two or three days afterwards. Physicians testified that this affliction arose from a sacroiliac sprain, and one of them devised a sort of body band which was bound tightly around her body and hips, which she wore to prevent this so-called slipping. This device greatly reduced the number of her slippings and falls, but was very annoying to wear in hot weather. There was expert medical testimony to the effect that the fact that no objective symptoms could be discovered would be without significance where the injury was in the ligaments around the sacroiliac joint.

The evidence for the defense was largely restricted to what could be elicited from plaintiff and her witnesses on cross-examination. It was developed that she was the mother of six children, that she had formerly been afflicted with gallstones and in 1920 she was in a hospital on their account. In 1922 she had fallen into an excavation

in a sidewalk and received injuries of such gravity as to cause her to have a miscarriage. Physicians who then examined her advised that her uterus should be removed, but this was not done. She had claimed damages for that injury against the parties responsible, and an insurance company in their behalf effected a settlement with her for $1,000. In the contract of settlement and release it was recited that she had claimed permanent injuries. Several physicians appointed by the court testified that on as thorough an examination as they were able to make that "as far as objective symptoms were concerned pertaining to the injury, we found none." These physicians also testified that the perineum of the cervex was lacerated—due to child bearing. She also had a rectocele. These would cause and account for pains in plaintiff's back. X-ray pictures of the sacroiliac joint and of the coccyx, taken at the time of the trial, which was about three years after the accident, showed these parts to be entirely normal. However, one of the physicians appointed by the court, an expert in X-ray work, testified:

"It is the accepted opinion that a patient may have a sacroiliac sprain without radiographic evidence."

We deem it needless to detail the evidence touching plaintiff's injuries at greater length.

The jury returned a verdict for plaintiff in the sum of $12,000, and answered special questions, viz.:

"1. State what amount you allow plaintiff for (a) physical pain and suffering, and (b) for loss of services to her husband.

"Answer: (a) $10,000; (b) $2,000.

"2. State what injuries you find the plaintiff sustained as a result of the fall from the street car.

"Answer: We, the jury, find from the evidence that the plaintiff sustained as a result of the fall from the street car that her spine was dislocated and injured and her back and hips were bruised, wrenched, sprained and thereby permanently injured."

Defendant's motion for a new trial urging most of the usual grounds was overruled; judgment was entered on the verdict; and the case is here for review.

The principal errors assigned center about the amount of the judgment—that the verdict was excessive and traceable to the trial court's refusal to give instructions which would have told the jury what significance should be attached to the evidence relating to previous ailments and injuries which had afflicted the woman at one time and another before her fall from defendant's street car. De-

fendant submitted the following instruction which the court refused to give:

"The plaintiff claims in her petition that the negligence of the defendant caused her great and permanent injury and damage as follows: That her spine was dislocated and injured and her back and hips were bruised, wrenched, sprained and injured, and that as a result of said accident and injury, she has been rendered sore, sick, emaciated and permanently crippled and has been caused and will hereafter be caused to sustain and suffer great physical pain and mental anguish, and will hereafter be confined to her bed for a long period of time. There is, on the other hand, evidence that the plaintiff sustained similar injuries previous to the accident complained of in this action, which were claimed by her to be permanent. In this connection, if you believe from the evidence that at the time of the accident complained of in the plaintiff's petition, the plaintiff was already suffering from similar permanent injuries which she had received in another accident, which had previously befallen her, then no damages can be assessed against the defendant for or on account of such previous premanent injuries, if any, that the plaintiff had so formerly received, nor for any disability or pain and suffering resulting therefrom, but only such damages may be assessed against defendant for such aggravation, if any, of such existing permanent injuries as you may find to have resulted from the accident complained of by the plaintiff in this case."

It will be noted that this requested instruction states that there was evidence that plaintiff had sustained "similar injuries," and if the jury believed she "was already suffering from similar permanent injuries" which had previously befallen her no damages should be assessed against defendant on that account. However, plaintiff's affliction of gallstones, which culminated in a sojourn in a hospital and a surgical operation in 1920, and which resulted in a complete cure, was not a "similar" injury to the one which gave rise to this action. Neither was her fall in the areaway in 1922 which caused her abortion. It is true that in her contract of settlement with the insurance company for that mishap in 1922 there was a preliminary recital which read:

"Whereas, I [plaintiff herein] claim damages against said Paul H. Larwell, Jessie Larwell and the T. G. Schweiger Contracting Company on account of the injuries sustained in said accident, which I claim to be permanent."

But that recital was merely set down as one of several bases for a compromise and settlement of a claim which the insurance company would have been privileged to deny and possibly disprove if the matter had been litigated. There was no evidence that the accident of 1922 did in fact leave any ill effects on the plaintiff. All the testimony on the point was that she had made a complete recovery within a short time after it happened. There was also a

good deal of testimony, with none to the contrary, that for several years immediately before her fall from defendant's street car plaintiff enjoyed perfect health and vigor. Moreover, the instructions which the trial court did give were a fair and comprehensive statement of the pertinent law, and the error based on the refusal to give the requested instruction cannot be sustained. (*Cavender v. Roberson & Co.*, 33 Kan. 626, syl. ¶ 2, 7 Pac. 152; *C. K. & N. Rly. Co. v. Stewart*, 47 Kan. 704, syl. ¶ 2, 28 Pac. 1017; *Honick v. Railway Co.*, 66 Kan. 124, syl. ¶ 1, 71 Pac. 266.)

Another error assigned pertains to the admission in evidence of exhibit 1, which was a letter from a physician who had made an X-ray photograph of plaintiff's lower spine and connecting bones and an examination of her back. The letter reads:

"Skiographic examination of Mrs. G. E. Ellis fails to show any bony lesion However, upon physical examination I am able to illicit [elicit] a palpable mass along the left spinal border. The mass seems movable, but the nature of same is not clear to me due to the patient's size and difficulty in palpation.
"W. T. McDOUGALL, M. D."

Doctor E. L. Asbell (testifying for plaintiff):

"I thought from the way she was complaining it would be well to get a picture of her spine, a picture of her back, and advised her to go to Doctor McDougall. . . .

". . . Plaintiff's exhibit A is the report that Doctor McDougall made to me relative to what he found from his examination and X-ray. That is Doctor McDougall's report and that is his signature and handwriting.

[COUNSEL FOR PLAINTIFF:] "We offer plaintiff's exhibit 1 in evidence.

[COUNSEL FOR DEFENDANT:] "We object to it unless the X-ray picture accompanies it. We think we should have all of the examination if part of it is introduced.

[COUNSEL FOR DEFENDANT:] "Further objection, no sufficient foundation has been laid.
"THE COURT: Objection overruled."

The objection now made to its introduction—"that it was a plain case of allowing an unsworn statement to be introduced in favor of the plaintiff, and constituted rankest hearsay"—was not urged against it in the court below. Furthermore, we think the contents of the letter of so little probative significance as to be quite immaterial, slightly favorable to defendant rather than plaintiff, and certainly nonprejudicial.

A much graver question, however, presses for attention on the

error assigned on the excessiveness of the verdict, particularly that part of it which allowed $10,000 for physical pain and suffering. This court has often said there is no precise yardstick for gauging the excessiveness of a verdict. This observation applies with particular force where the award is for pain and suffering occasioned by an injury which has no objective symptoms. In *Hardwick v. Railways Co.*, 114 Kan. 843, 845, 220 Pac. 1043, which was an action for damages for injuries sustained when defendant's street car collided with the rear of plaintiff's automobile, the jury allowed $500 as damages to plaintiff's automobile and $3,000 for pain and suffering. On appeal it was argued that the verdict was excessive. This court said:

"Error based on an excessive verdict and judgment is seldom an easy question for an appellate court to solve, and it is peculiarly difficult where the sum allowed is for pain and suffering. Of course, rules for dealing with excessive verdicts are not altogether wanting; if on reading the record the conscience of the court is shocked at the verdict, a remittitur or reversal is ordered; but there is no uniform yardstick, no hard and fast rule, by which the excessiveness of a verdict can be measured and determined as in ordinary mathematical calculations. In this case, when we give full credence to the plaintiff's testimony touching his pain and suffering, as we are bound to do because the jury gave it such credence, the verdict and judgment are not so large as to produce such psychological reaction on the judicial conscience as to impel it to order a reduction or reversal."

In *Fenn v. Kansas Gas & Electric Co.*, 118 Kan. 131, 134, 234 Pac. 7, it was said:

"An excessive verdict and judgment is one of the most difficult problems which an appellate court has to 'deal with, as there is no uniform standard which can be used to measure the adequacy of verdicts for bodily injuries, including past, present and future pain and suffering; so it has come about that unless the award is so great as to shock the conscience of the reviewing court the verdict and judgment will not be modified or set aside." (p. 134.)

See, also, exhaustive note on excessive verdicts in 46 A. L. R. 1230-1424.

On assignments of error based on excessive verdicts this court has frequently ordered a remittitur of part of the judgment, conditioned, of course, upon the plaintiff's acquiescence therein with the alternative of a new trial where plaintiff does not consent. Such practice is in strict accord with the civil code, §§ 307, 581, R. S. 60-3004, 60-3317; *Aaron v. Telephone Co.*, 89 Kan. 186, 131 Pac. 582; *Yard v. Gibbons*, 95 Kan. 802, 149 Pac. 422; *Truman v. Rail-*

*road Co.,* 98 Kan. 761,·syl. ¶ 6, 161 Pac. 587; *Williams v. Hanna,* 105 Kan. 540, 547, 185 Pac. 17; *Carl, Admx., v. Ackard,* 114 Kan. 640, 220 Pac. 515; *Stone v. City of Pleasanton,* 115 Kan. 378, 223 Pac. 312; *Fenn v. Kansas Gas & Electric Co.,* supra; *Seigler v. Kansas City,* ante, p. 504.

In *Tartar v. Missouri-K.-T. Rld. Co.,* 119 Kan. 738, 241 Pac. 246, the jury returned a verdict of $20,000 for permanent injuries and for pain and suffering, and in their special verdict itemized the damages thus: (*a*) pain and suffering, $10,000; (*b*) permanent injury, $10,000. This court ordered a remittitur of $5,000 with an option to plaintiff to demand a new trial. This court said:

"While pain and suffering are hard to measure and harder to compensate, yet $10,000 is an extremely large amount to allow when compensation is the only matter to be considered after ascertaining as far as possible the extent of the suffering. The amount for pain and suffering is so large that ·this court cannot allow it to stand." (p. 742.)

In the present case, after making due allowance for those differences of opinion which the jury and· trial court were entitled to hold, this court feels impelled to decide that the item of $10,000 for physical pain and suffering is at least 25 per cent too much, and it is therefore reduced to $7,500, if plaintiff will consent thereto; otherwise there must be a new trial. If plaintiff consents to the remittitur, the total judgment will ˙be modified by reducing it from $12,000 to $9,500, and so modified it will be affirmed. It is so ordered.