No. 31,861

J. W. SOUTHERN, *Appellant*, v. W. B. LINVILLE and MARIE LINVILLE, His Wife; and THE FARMERS' STATE BANK OF CHASE, *Appellees*.

(33 P. 2d 123.)

Opinion filed June 9, 1934.

*William Osmond, Elrick C. Cole, T. B. Kelley,* all of Great Bend, *Walter F. Jones, C. E. Chalfant* and *J. Richards Hunter,* all of Hutchinson, for the appellant.

*Ben Jones,* of Lyons, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action for specific performance of a contract relating to the sale of a quarter section of land, brought by J. W. Southern against W. B. Linville and his wife and the Farmers' State Bank of Chase. The contract on which the claim is based provided that the plaintiff should pay $2,000 down on the transaction; that two notes should be executed by Southern, one for the payment of $1,000 on September 1, 1928, a second note for $1,200 should be paid on or before August 1, 1929, and that plaintiff should assume the payment of the Fontron loan of $4,000, and a second one of $3,500 belonging to J. B. Goldman. These papers were deposited in escrow with the Farmers' State Bank of Chase on April 19, 1928.

It was found upon evidence that Southern paid the $2,000 at the time of the sale, and the $1,000 note due on September 1, 1928, but that he failed to pay the $1,200 note due August 1, 1929, and has

made no payment since the first of September, 1931. Interest payments were made on the Fontron loan, but no part of the principal, and on October 29, 1932, that mortgage was foreclosed. Southern was a party to the action, but did not appear nor defend, and judgment of foreclosure was taken on December 23, 1932, in which it was adjudged that he be forever barred, etc.

In pursuance of that decree the property was sold by the sheriff on February 7, 1933, to the National Life Insurance Company, which was a successor to the Fontron Loan Company, and that sale was approved by the court. The indebtedness due to Goldman, which was assumed by Southern, was found to be a valid and existing indebtedness of Linville and his wife. The court found that Southern had informed Linville that he could not and would not pay said indebtedness so assumed by him, and that he no longer claimed any interest in this land under their contract.

It was found that he refused and failed to pay taxes on the property for 1932, and that such taxes were paid by the Life Insurance Company. It was found that plaintiff had not paid the note of $1,200 due on or before August 1, 1929; that he had made no claim to any oil or gas leases or rental due to the owner of the real estate on account of oil and gas mining leases, but instructed the depositary, Farmers' State Bank of Chase, to pay the same to the defendant, Linville. There was a finding, too, that in the wheat allotment transaction of 1932 Southern, under oath, asserted that he was the tenant and that the defendant, W. B. Linville, was the owner of the quarter section.

The court found that since the making and execution of the contract the land has increased in value and that the reasonable market value of it at the time of the trial was approximately $24,000. The court ordered and adjudged that plaintiff had failed, refused and neglected to perform or carry out the contract of April 19, 1928, according to its terms; that he had failed to make proper tender into the court of the payment of the sums assumed to be paid prior to the bringing of this action or at the hearing of this action; that Southern had abandoned the contract and any right he might have had thereunder and was a tenant of the real estate of Linville, the owner thereof; and he is not entitled to any rentals of oil or gas leases, and is not entitled to credit for the delay money rentals in the sum of $160; and that he was not entitled to specific perform-

ance of the contract. Motion for a new trial and to set aside the findings of the court were overruled by the court.

The principal point made on the part of plaintiff was that Linville, the grantor, had not accepted plaintiff's abandonment and repudiation of the contract; that it was an essential element of Linville's defense that he release the plaintiff from his liability as a debtor of defendant, and a failure to prove consent of plaintiff's wife to the abandonment and repudiation of the real estate contract affecting her homestead.

Error in admitting evidence and excluding other evidence is a matter of complaint. That the court had no authority to quiet the title of the defendant, W. B. Linville, in an action for specific performance, and the answer of defendant Linville contained no prayer asking to have his title quieted.

Southern and his family went into possession of the premises on August 1, 1928, and they have been living there ever since that time. When the $1,200 note became due August 1, 1929, the depression rendered him unable to pay the note; he paid taxes and made payments on the two mortgages which he assumed, but after September 1, 1931, no payments of any kind on account of the contract were made. When Southern came into court in this case he tendered payment of the $1,200 note, and asks for performance; but at that time the mortgage to Fontron had been foreclosed, and the sale had been made, taxes had been paid by the purchaser, the National Life Insurance Company. In January, 1934, Southern tendered to Linville payment of the $1,200 note and demanded the deed which the bank held in escrow.

It is true that the plaintiff was in default on the $1,200 note payable on August 1, 1929, and that the indebtedness assumed had not been paid. He had paid Linville $3,000 in 1928, had been put in possession of the land and with his family had occupied the farm since as their homestead. In his testimony he said that he had made interest payments on the Fontron loan, which had been assumed, in 1928, $110; in 1929, $220; in 1930, $220; in 1931, $220; and in 1932, $220, amounting in all to $990. Interest on the Goldman loan was paid, $200 in 1928, and the same amount annually up to 1931, amounting to $840. With the payment of the $3,000 in 1928, and the interest payments under the contracts since that time, he had paid also for taxes $136.28 in 1928; $142.30 in 1929; $103 in 1930; and $94.67 in 1931; in all $476.25. When the $1,000 note was

paid there remained a $1,200 note due the following year, but this he was unable to meet when it was due. He testified that he made improvements on the house, put a floor in the kitchen, put in most of the windowlights in the house, put on plaster and shingles, built two hog sheds and a half mile of fence, which, aside from the labor, cost him about $100.

While he had expressed inability to make payment of the $1,200 and the assumed indebtedness, the court found that before the foreclosure of the Fontron loan was brought, plaintiff was discouraged and said he could not and would not pay the loan, and that he no longer claimed the land. That when oil was discovered in the neighborhood Southern made no claim on the oil leases or the delay money rentals, but indicated that the indebtedness should be paid to Linville, and that since the foreclosure he had delivered crops to Linville as landlord and had executed and delivered an allotment of wheat with the United States in which he represented Linville as the owner of the land.

The plaintiff further testified that he did not tell the depositary bank or authorize it to turn over the oil money to Linville, and he further said that he and his wife and child had been given possession of the land in 1928 and were still living on it as their homestead. That he had never relinquished any rights in the farm, and that while the Fontron mortgage had been foreclosed, he still had the right of redemption for eighteen months; and he further said that, despite the fact that he was unable to make the payment of the $1,200 note, he had never told anyone he had given up his rights in the farm.

The oil discovery on the adjoining farm, half a mile from the premises in question, changed the situation. Witnesses said that this operated to add about $75 to $100 a royalty acre, and that there were 160 acres of the farm, and the court found that it had been sold to Southern in 1928 for $11,700, and was now worth approximately $24,000. Southern, it appears, had made arrangements so that he could tender payment of the $1,200 note to Linville, and he therefore demanded a deed to the farm, but Linville refused to accept the offer; and he also asked for the money received on oil rentals which had been paid by the depositary to Linville.

The action for specific performance was brought by Southern in January of this year, and it is insisted that the delivery of the deed executed and placed in escrow with the depositary bank, which has

been made a party to the plaintiff's action, did not change their relations. Judgment was given as stated, and the right to specific performance was denied.

The plaintiff is insisting that the fact that he was unable to make payment on the land, and had made statements to that effect to his neighbors, did not change the relations of himself and Linville, and that if the statements made should be interpreted as the giving up of hope that he could carry out the contract, and if there had been a proposition to abandon the contract it had never been accepted by Linville. That his $1,200 note had not been canceled nor offered to him, and that the contract itself had no provision for forfeiture and had not been forfeited. The land was actually sold to Southern, and he and his family have been in possession of it since 1928, and his wife had not surrendered her homestead right, and even if his own action should be held as a surrender, that of the wife could not be taken without her consent.

Southern's possession of the farm was not disturbed when his note of $1,200 was not paid on the first of August, 1929. There was no provision for forfeiture in the contract, and Linville did not treat the time of payment as of the essence of the contract after that time. He did not insist that Southern's failure to pay at the time it was due ended his right to the land. He knew the effect of the depression and that many with limited means were unable to meet promised payments. He had then paid over $3,000 on the farm and he continued to make interest payments afterwards on the assumed loans for about two years, and also to make the payment of taxes. Linville apparently was willing to continue the contract relation in the hope that better times would come and payment could then be made. At any rate he did not try to cancel the contract. That was still held in escrow, and the depositary had no right to cancel the $1,200 note. It was still an obligation of Southern upon which an action might have been brought against him. Linville had not indicated a purpose to end the contract relation, and Southern made payments of considerable sums of interest due, taxes and improvements under the contract, for about two years after payment of the note was due. He did tell Linville late in 1932 that he could not hold the place, and he wrote Glasscock, president of the Fontron company, that he wouldn't try to hold it, but the evidence does not show that Linville accepted those statements as an abandonment of the contract.

It is insisted that there must be a mutual abandonment of such a relation before it would become effective. There was no evidence of any acceptance, and up to the time of judgment Linville had not told Southern that he accepted the abandonment of the contract or had released Southern from the payment of the note. Southern did not find means to meet this note until near January 1, 1934, when the present proceeding was brought. What is the equitable rule in this situation? At last, and before a rescission had been made, plaintiff found a way of financing the transaction and of tendering the amount due on the note and asking for a deed, to which he would then be entitled. It is the opinion of the court that in view of the circumstances and the contract and the conduct of the parties, it is equitable and just that Southern be allowed to perform and obtain his deed. The fact is that the indebtedness assumed by him may have to be extended or renewed. This may be done within the time of redemption.

Then there is the homestead privilege of Mrs. Southern, which it is insisted has not been consented to effectively nor surrendered by her. The title held by the Southerns was more than a contract to purchase land at a future time, leaving notes which had been executed and delivered to the depositary to be subsequently paid. The sale, so far as the title was concerned, was practically made in April, 1928, and the plaintiff then acquired at least an equitable ownership with the possession of the land. In *Jones v. Hollister*, 51 Kan. 310, 32 Pac. 1115, it was decided:

"A written bond or contract for a deed of land, putting the purchaser thereof in immediate possession, and containing no provision for the forfeiture of the bond or contract if the purchaser fails to pay the installments of purchase money due thereon, passes the entire equitable estate to the purchaser. The legal title is merely held by the vendor as security for the payment of the balance of the purchase money." (Syl. ¶ 1.)

In Williston on Contracts, page 1515, the distinguished author, speaking of a contract where the buyer is placed in possession, says:

"Where, as generally happens, the buyer is given possession of the land the case might well be, and indeed should be, distinguished from an ordinary executory contract to buy and sell. Even in the case of personal property where there is no right to specific performance, much authority recognizes that the buyer in possession under a conditional sale is the beneficial owner, and the seller in substance a mortgagee. If this is true of personal property, it is still more clearly true of real property. The relation of a vendor and purchaser of realty, even under a wholly executory contract, has been likened to the relation of mortgagor and mortgagee. This seems inaccurate, but where

the purchaser is given immediate possession and beneficial enjoyment of the land, the analogy seems a sound one. If so, the situation should be dealt with in the same way as a mortgage situation is dealt with."

In *Yost v. Guinn,* 106 Kan. 465, 188 Pac. 427, it was said:

"The general rule is that where land is sold in part upon credit, under a contract that the deed is to be made upon completion of payment of the agreed price at a fixed time, which is not made of the essence of the agreement, no provision for forfeiture being made, the purchaser upon taking possession becomes the equitable owner, the vendor retaining the legal title only as security for the unpaid balance of the purchase price, the relations of the parties being substantially that of mortgagor and mortgagee. (*Courtney v. Woodworth,* 9 Kan. 443, 451; *Jones v. Hollister,* 51 Kan. 310, 32 Pac. 1115; 27 Cyc. 981.)" (p. 467.)

So far as the homestead right is concerned, the interest acquired by Southern afforded at least an equitable estate in the land and entitled them to the protection of the homestead law. Where a purchaser of land has been put into possession and notes are given for the remainder of the purchase money and a deed is executed and delivered to a depositary to be given to the grantee when final payments are made, there is in legal effect a delivery to the grantee, subject to a completion of the payments. The depositary was the agent of both parties. (*Gault v. Hurd,* 103 Kan. 51, 172 Pac. 1011.) An estate so acquired falls within the protection of the homestead law, and it cannot be alienated without the joint consent of both husband and wife. There was no consent of the wife to the abandonment of the land, as we have seen no surrender of any of her rights in the possession, even if the husband had made an intentional abandonment of it. It has been held that the attempt of a husband alone to assign to another the homestead, where there is no consent of the wife to his assignment, is absolutely void. (*Moore v. Reaves,* 15 Kan. 150.) Mrs. Southern, it is conceded, had no negotiations with reference to yielding her homestead rights, has given no consent to a surrender of the place, and the homestead law protects her interest. It is said that the law protects a leasehold interest and any equitable interest of land of which the claimant's family has possession. (*Tarrant v. Swain,* 15 Kan. 146; *Hogan v. Manners,* 23 Kan. 551; *Stowell v. Kerr,* 72 Kan. 330, 83 Pac. 827; *Walz v. Keller,* 102 Kan. 124, 169 Pac. 196.)

In *Walz v. Keller,* supra, it was decided:

"A homestead right attaches to land obtained under a contract of purchase where the purchaser and his wife occupy the land as a residence, and a new

contract modifying the contract of purchase and stipulating for a surrender of possession in certain events, and also a contract of lease executed between the purchaser and the seller, none of which were signed by the wife, and to which she gave no consent, are absolutely void." (Syl. ¶ 1.)

The homestead right, therefore, attached to the land purchased and occupied by the family of Southern, and there has been no joint consent of the wife to an abandonment or surrender of the homestead right. If the husband abandoned the contract, such abandonment was absolutely void under the authorities cited and furnishes another reason why the statements made by Southern as to not being able to pay the $1,200 note do not preclude the enforcement of the contract right. There was no effective abandonment of the contract and, under the findings of the court, the plaintiff has the right to complete the contract, make the payment of the balance of the purchase money and obtain his deed, which is held in the depositary bank as security for such payment.

The judgment will therefore be reversed, and the order is that upon payment of the money tendered, the amount due upon the note, the plaintiff shall be adjudged to have the contract specifically enforced. It is so ordered.