No. 47,992

WAYNE L. FORD AND MARGARET W. FORD, *Appellees and Cross-Appellants*, v. GUARANTEE ABSTRACT AND TITLE CO., INC., CHICAGO TITLE INSURANCE CO., JESSE H. CLAY, JR., and CONNIE G. CLAY, *Appellants*.

(553 P. 2d 254)

Opinion filed July 23, 1976.

*George Maier, Jr.,* of Weeks, Thomas, Lysaught, Bingham & Mustain, Chartered, of Kansas City, argued the cause, and was on the brief for the appellants, Guarantee Abstract and Title Co., Inc., and Chicago Title Insurance Co.

*Richard D. Rixner,* of Alder, Rixner & Zemites, of Shawnee Mission, argued the cause, and *John J. Alder* and *Darrell D. Wiard,* both of Shawnee Mission, were on the brief for the appellants, Jesse H. Clay, Jr., and Connie G. Clay.

*Robert E. Fabian,* of McAnany, Van Cleave & Phillips, P. A., of Prairie Village, argued the cause, and was on the brief for the appellees and cross-appellants.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action by the purchasers of real estate who paid the full purchase price, but the sale was never consummated and title never transferred to the plaintiffs. Upon refusal to return the funds after demand the purchasers sued the sellers, the real estate agents, the title insurance company and its agent and a mortgage company dealing with the funds. Some defendants were sued in contract and some in tort. On trial to a jury a verdict was returned for the plaintiffs against some of the defendants for actual and punitive damages. Some of the defendants have duly perfected an appeal, and the plaintiffs have cross-appealed, raising various issues.

Wayne L. and Margaret W. Ford (plaintiffs-appellees and cross-appellants) decided to purchase a new home. The Fords looked

at many homes with Mr. Walker, a salesman for Barkyoumb Realtors. The Fords located a house at 7826 Haskell, Kansas City, Kansas, which they liked.

That house was owned and occupied by Jesse H. Clay, Jr., and Connie G. Clay (defendants-appellants). On October 25, 1971, the Clays had purchased, by warranty deed, the property from Larry J. and Doris Faye Slavens. At that time the Clays mortgaged the property to Empire Mortgage and Investment Co., Inc., (defendant) (hereafter Empire) in the sum of $23,000.00 to pay the Slavens and to remove a construction loan placed on the property by the Slavens in the amount of $23,000.00. Empire failed to record the October 25, 1971, deed from the Slavens to the Clays and the mortgage given by the Clays. Its failure to record these documents was not known by either the Clays or the Slavens. Thus the record title to the property at 7826 Haskell continued to be vested in the Slavens with the Slavens' construction mortgage to Empire and the subsequent assignment of that mortgage to the Wornall Bank being shown on the record title. On October 25, 1971, there were no judgments or suits pending against the Slavens, unpaid bills, or any other obligations which could be the basis for mechanics' liens. However, after the October 25, 1971, sale of the 7826 Haskell property to the Clays, the Slavens had judgments entered against them, and suits pending against them in the Wyandotte County District Court. A title search would, therefore, indicate serious title deficiencies.

On March 28, 1972, the Clays, thinking they had legal title, entered into a written agreement with the Fords by which the Clays agreed to sell the 7826 Haskell property for $28,000.00. This sum represented the majority of the Fords' life savings, and at the time of purchase Mr. Ford had been recently retired because of ill health. By the terms of the written agreement the Fords were to receive a good and sufficient warranty deed to the 7826 Haskell property free of liens or other title defects, and were to receive a proper owners' title policy insuring their title.

The Fords made a $1,500.00 down payment to Barkyoumb Realty. After receiving the down payment, Roy Barkyoumb telephoned Guarantee Abstract and Title Co., Inc., (defendant-appellant) (hereafter Guarantee) to order an owners' title insurance policy from Chicago Title Insurance Company. Guarantee is an agent for Chicago Title Insurance Company for the purpose of

issuing title insurance policies and for handling all written trans-
actions in the furtherance of issuing a title insurance policy. Mr.
Barkyoumb talked with Edward Fogarty, house counsel for Guaran-
tee, and one of two persons in the Guarantee office authorized to
issue Chicago title insurance policies. Mr. Barkyoumb testified
that Mr. Fogarty advised him in their first conversation concerning
the matter there was a deed in escrow which predated judgments
and pending lawsuits against the fee titleholders, the Slavens, and
that said deed would clear the title of any clouds. Mr. Fogarty is
reported to have assured Mr. Barkyoumb *the title company would
issue an owners' title policy and that Mr. Fogerty would take care
of any technical parts of the transaction.* Mr. Barkyoumb ordered
the title policy in question on that basis. *Mr. Fogarty was aware
of the unrecorded deed from the Slavens to the Clays held in
escrow at the Wyandotte County title company because he had
cleared the title on another piece of property the Slavens were
selling in Wyandotte County.*

While talking to Mr. Barkyoumb, Mr. Fogarty took the order
for a Chicago title insurance policy and made entries on a
Chicago title application form. Mr. Zimmerman, vice-president of
Guarantee and the other person authorized to issue Chicago title
insurance policies, testified it is good title practice to get the legal
description of the property, the name of the seller and the name of
the buyer, the purchase price and the name and address of the party
or parties to whom the title report should be forwarded. In the
instant case, *Mr. Fogarty failed to note the Clays were the sellers
on the Chicago title application form,* and he failed to note the
date the order was placed. Since the Clays' name did not appear
on the Chicago title insurance application form, or on any recorded
deed, the title company ran no check under their name with regard
to judgments, pending lawsuits or liens.

On April 14, 1972, Guarantee issued an instrument called
"Chicago Title Insurance Company Title Report" which report
is in effect a commitment of the Chicago Title Insurance Company
to issue a title policy when the exceptions in the title report have
been satisfied. The title insurance report, No. T-101002, showed the
record title to the 7826 Haskell property to be in the Slavens'
names, that the property was mortgaged to Empire which had in
turn assigned the mortgage to the Wornall Bank. The title report
noted a judgment and three lawsuits against the Slavens pending

in the Wyandotte County District Court. Two copies of this title report were mailed to Mr. Barkyoumb at his office. However, the Fords testified they never saw this title report.

At the end of the "CHICAGO TITLE INSURANCE COMPANY TITLE REPORT" above the signature of Edward G. Fogarty "Attorney" is a notation reading as follows:

"NOTE: With reference to the foregoing Court Cases we are advised by Larry Slavens that there is a deed in escrow. We should be furnished with said deed for our examination and approval prior to recording together with an affidavit surrounding the escrow agreement as to the time and place of escrow and the time when deed was removed from escrow."

*Mr. Fogarty testified* he advised Mr. Barkyoumb that if the deed from the Slavens to the Clays, which predated the lawsuits and judgment against the Slavens, was found to be properly in escrow, then the exceptions in the title report would be deleted from the title policy; he further advised that the noted exceptions could be deleted by causing the pending lawsuits to be continued for 120 days. In any event *he advised Mr. Barkyoumb that the exceptions would be deleted one way or the other.*

On April 17, 1972, Mr. Barkyoumb asked the Fords to come to his office to close the transaction. Mr. Barkyoumb advised the Fords that everything was in order, and that they would have a guaranteed and insured title in a few days. The Fords then paid the balance of the $28,000.00 purchase price (the check was for $26,203.31 which was $28,000.00 less $1,500.00 down payment and pro rated taxes) and Mr. Barkyoumb gave them a "closing statement." *According to Mr. Ford, when the Fords gave their check to Mr. Barkyoumb, he informed them the money would go into his escrow account and would stay there until they were delivered a good title.*

Thereafter, Mr. Barkyoumb requested and received a payoff letter from Empire. This letter was dated April 20, 1972. It disclosed the payoff on the Slavens' loan (principal and interest) as of April 20, 1972, to be $25,721.85 with interest of $6.07 per day. *On April 24, 1972, Mr. Barkyoumb used $25,746.13 of the Fords' money from his escrow account* to purchase a cashier's check payable to Empire. On that same day he took this cashier's check to Guarantee. There he talked with a secretary in the office and told her *to give the check and the payoff letter from Empire to Mr. Fogarty, and to deliver the cashier's check to Empire in exchange for a deed, a mortgage release and an affidavit establishing the escrow arrange-*

*ment. Mr. Barkyoumb said he took the cashier's check to Guarantee because Mr. Fogarty had agreed to clear the clouds on title.*

Mr. Fogarty was not in the office on April 24, 1972, so Carl Zimmerman, vice-president of Guarantee and the second person authorized to sign title insurance policies, verified the amount of the check with the payoff letter and interest, reviewed the file *which included the title report* and then went to the Empire Mortgage Company. Upon arriving at Empire, Mr. Zimmerman asked for Mr. Clark who had written the payoff letter to Mr. Barkyoumb. Mr. Clark was not in, so Mr. Zimmerman talked with Marion Jordan, president of Empire. Mr. Jordan was unfamiliar *with the Clay file* and could not find it at the time. Mr. Zimmerman explained his mission and Mr. Jordan told him he would relay the information to Mr. Clark who would produce the deed and the mortgage release. Since the cashier's check was only good up to April 24, (because of the interest factor) Mr. Zimmerman left the check with Mr. Jordan of Empire, taking a receipt in exchange therefore.

The Slavens' mortgage assigned to the Wornall Bank shown on the title report was paid off by Empire and Guarantee received the mortgage release of the Slavens' mortgage from Empire in the mail on April 25, 1972, but Guarantee never received the deed or the escrow affidavit necessary to establish good title in the Fords. (Note at this time Empire was holding an unrecorded mortgage of the Clays upon which the Clays were making payments to Empire on the same property.) Thus Guarantee had succeeded in clearing the Slavens' property of a substantial mortgage lien by the use of the Fords' money, but had not accomplished anything toward putting the Fords in title. As time passed and the Fords could not get a clear title, they wanted their escrow money back from Mr. Barkyoumb, who made demand upon Guarantee to either clear the clouds on the title and give a Chicago title policy or return the money represented by the cashier's check. Guarantee in turn made demand upon Empire for return of the money. Guarantee was unable to get Empire to return the cashier's check. Upon a similar formal demand by the Fords' counsel, *Guarantee refused to give a Chicago title policy or to return the money represented by the cashier's check. Guarantee refused, advising that they could not establish good title, would not give a title policy and did not have the money to return.*

It should be noted both Mr. Zimmerman and Mr. Fogarty

claimed to be experienced professional title men. Furthermore, Guarantee held itself out as expert and creative in title work and advertised their claim of expertise to the public.

When this dispute went to trial, the Fords called M. E. Chadborn, the third generation owner and operator of an abstract business in Wyandotte County who had been actively engaged in that business for approximately 37 years. After being shown a copy of the Chicago Title Insurance Company's title report and being advised that the contract sellers were the Clays, Mr. Chadborn testified that since the record fee title was shown to be in the Slavens, the fact the Clays were the contract sellers was a red flag, a danger signal, that the interest of the Clays would have to be determined and they would have to divest themselves of whatever interest they had. Mr. Chadborn testified the cardinal rule in title work is to refrain from paying out the buyer's money until the title company's agent has the proper deed in his possession which puts the buyer in title. Mr. Chadborn characterized the conduct of Mr. Zimmerman in handing over the escrow money without ever seeing any deed as a reckless disregard of the property rights of the Fords and their money. He testified as a title insurance man he would occasionally leave funds at a lending institution in order to obtain a mortgage release, but not in order to obtain a deed.

*Mr. Fogarty, Guarantee's house counsel, testified that the mortgage on the property in question should not have been paid off until the instruments were obtained which would perfect title in the purchasers.* It was his opinion as an attorney and an expert on abstract and title work that *it was a serious title error to cause a mortgage on property to be paid off prior to being assured that there was good title to the property.* Mr. Zimmerman agreed saying that the agent of a title insurance company who accepts a buyer's money to pay off a mortgage or mortgage lien is absolutely responsible to the buyer to refrain from paying out the money until the title insurance company or its agent has a proper deed in its possession which puts the buyer in title.

The Fords sued the defendants, both jointly and severally, for actual damages in the sum of $28,000.00, plus interest from and after April 17, 1972, for consequential damages in the sum of $10,000.00 and for the costs of this action. The Fords sued the Clays and the Slavens on a contract theory based upon the con-

tract of sale. The Fords proceeded against Barkyoumb, Chicago Title and Empire on a tort theory based on negligence. At the pretrial conference the Fords were permitted to amend their first amended petition to allege, as journalized in the pretrial order, that Barkyoumb, Guarantee, Chicago Title and Empire "acted with a gross neglect of duty so as to evince a reckless indifference to the rights of the plaintiffs resulting in conversion of plaintiffs' money and are responsible to plaintiffs for punitive damages."

The trial court instructed compensatory damages which could be awarded against the defendants Barkyoumb, Guarantee, Chicago Title and Empire, if the jury found them liable, could not exceed the sum of $34,743.62; and, if liable for punitive damages, the amount awarded should not exceed $100,000.00 against Chicago Title, $50,000.00 against Guarantee, $25,000.00 against Barkyoumb and $25,000.00 against Empire.

Cross-claims and other matters were determined by the court without a jury, and except as may hereafter be noted, they are immaterial to the issues raised on appeal. Among the matters determined by the court prior to trial was a sale of the property in question. The court ordered the deed from the Slavens, as grantors, to the Clays dated October 25, 1971, be placed of record. Empire had lost or could not locate the original deed and a copy was ordered in its stead. This was done pursuant to the agreement of all of the parties to the action, and the property was later sold at a public sale. The net proceeds from the sale, $22,886.86, were paid into court "to await disposition by the Court to the persons entitled thereto after adjusting all equities between the parties as may be shown to the Court." The court also declared null and void and of no further force and effect the unrecorded note and mortgage, dated October 25, 1971, executed and delivered by the Clays to Empire in the sum of $24,700.00.

This case went to trial before a jury on the same day the funds from the sale of the property were paid into court. The jury was never informed concerning the sale or of the proceeds of the sale.

On June 21, 1974, the jury returned a verdict *in favor of the Clays and the Slavens and against the Fords on their contract action.* However, the jury found for the Fords and against the defendants Barkyoumb, Guarantee, Chicago and Empire. Each of the four defendants was ordered to pay compensatory damages in the sum of $8,687.65. Furthermore, punitive damages of

$12,500.00 were assessed against Barkyoumb; punitive damages of $35,000.00 were assessed against Guarantee; punitive damages of $70,000.00 were assessed against Chicago; and punitive damages of $20,000.00 were assessed against Empire.

Judgment was rendered on the above verdict June 21, 1974, as disclosed by a journal entry filed June 26, 1974.

Thereafter Guarantee and Chicago filed motions for a directed verdict in their favor notwithstanding the verdict or in the alternative for a new trial. These motions and others were heard by the trial court on August 2, 1974. The matters were taken under the advisement and on August 23, 1974, by a letter decision, the trial court reduced the punitive damages assessed by the injury against the defendant Barkyoumb to $5,000.00; against Guarantee to $25,-000.00; and against Chicago to $25,000.00. The court further ordered a distribution of the amount on deposit in the clerk of the district court's office (largely from the sale of the 7826 Haskell property), less court costs, to be paid to the plaintiffs. However, the court further directed the clerk to credit the account of the defendants Barkyoumb, Guarantee, Chicago and Empire "with an amount equal to one-fourth of the amount distributed to the plaintiffs."

The foregoing was journalized by a journal entry filed October 7, 1974. The journal entry recited, among other things, that all cross-claims of the respective defendants against any and all other defendants, except Guarantee's cross-claim against Empire, were denied and disallowed. (Empire is apparently defunct because from this point in the record there is nothing further concerning Empire's activity in the case.)

Guarantee and Chicago appealed contending they owed no money to the Fords, and that the trial court erred in awarding punitive damages. The Clays appealed from the order of the trial court distributing funds derived from the sale of the property, title to which had been cleared in their name, to the Fords. The Fords cross-appealed from the order of the trial court reducing the punitive damage awards against Guarantee and Chicago Title without the consent of the prevailing party. No appeals were taken by Barkyoumb, Empire or the Slavens. The Fords have not appealed from the judgments in favor of the Clays and the Slavens, absolving them from liability on the contract. The Fords did not appeal from the order of the trial court reducing the punitive damage award against Barkyoumb.

Aside from peripheral questions and the points asserted in the

Clays' cross-appeal, the basic legal issue presented on the facts in this case boils down to the validity of the Fords' tort action against the title insurance company and its agent. The gravity of this basic issue involving title insurance companies is indicated by the failure of counsel for the appellees and exhaustive research by this court to uncover a bay horse case in American jurisprudence.

Prior to World War II in Kansas if the owner of real property desired to sell his property, he first entered into a preliminary agreement with the buyer and then arranged to prove his title by going to an abstractor to obtain an abstract or cause an existing abstract to be brought up-to-date. The abstract was delivered to the buyer who then hired an attorney to examine it and give him a written opinion identifying the fee title holder, noting any liens or encumbrances and making exception as to any title defects or faults commonly known as clouds on title. If there were no clouds on title and no liens, the transaction was ready to close and the buyer's attorney prepared the deed, any other required instruments and a closing statement. Upon conveyance, payment and recording the transaction was complete. If there were liens not being assumed the owner either paid them or arranged for the buyer to pay them out of the purchase price and the transaction was ready for closing. If there were clouds on title, the owner hired an attorney to clear the title by such action as was necessary and to represent the owner at closing, after one or both attorneys had prepared the required papers. Ofttimes the funds required for closing were placed in the attorney's hands to be held for subsequent distribution when the buyer was placed in title.

Under this so-called abstract method there was at least a buyer's attorney involved who had examined the complete record history of the property and determined what must be done to place the buyer in good title. The attorney had a duty and professional responsibility to his client to examine the abstract skillfully, avoid any errors and omissions in his opinion and to avoid any mishandling of his client's money.

In short, the buyer's attorney had the duty to either place his client in good title or advise against the purchase. The abstractor performed the essentially mechanical function of making a complete search of the appropriate records and preparing an abstract of all instruments or proceedings concerning the property, without opinion or judgment on his part as to their sufficiency or legal effect.

His sole responsibility was to accumulate an accurate and complete title record of the property.

In the 1950's the use of abstracts to prove the seller's title began to decline, particularly in the metropolitan areas of the state, and the combination of title report and a title insurance policy was increasingly substituted for that purpose. By the late 1960's the transition was almost universal and the abstract method was rarely used in metropolitan areas.

Under the title insurance policy method a contract seller or his realtor goes to the local agent of a title insurance company and makes application for *a title policy to be issued in the name of the purchaser* in the amount of the purchase price. The local insurance agent requires certain minimum information to complete the title company's application form: The name of the seller, the name of the buyer, the description of the property and the purchase price. It is important that this information be both obtained and noted on the application form: (1) So the local agent's employee making the search for pending lawsuits, unpaid taxes, and judgments will look to the proper records under that name; and (2) so the employee making the title search will be alerted to a serious title problem if the seller's name is at variance with the name of the record fee titleholder.

Armed with the above information from the application form an employee of the local agent for the title insurance company goes to the courthouse and in various offices proceeds to search out and examine all instruments and proceedings of record concerning the property. He is not making a search to accumulate the records in an abstract, but is in fact examining each instrument and proceeding, whether divorce, bankruptcy, tax foreclosure, mortgage foreclosure, probate estate, condemnation, partition or whatever to then and there form his opinion and judgment as to the sufficiency and legal effect of the same so as to pass good title in each instance. The former function of the buyer's attorney in examining the abstract of title is now performed by the title insurance company's examiner. The examiner also makes a search in the name of the record fee titleholder to determine if the property in question may be subjected to liens by reason of judgments, unpaid taxes or pending lawsuits.

The conclusions and findings of the examiner are then incorporated into the title insurance company's title report commitment to

the buyer showing: The description, the name of the record fee titleholder, any liens or encumbrances, any title faults or defects which must be cleared before the title company will insure the title without exception from coverage, and the purchase price. The title report is then forwarded to the parties in accordance with directions given by the applicant for the title policy (usually the realtor, seller or buyer).

If the title report indicates clouds on the title, they must be cleared to the title company's satisfaction before the transaction can be closed and the title insurance policy issued. One or more persons, usually attorneys, employed by the local agent of the title insurance company will have been authorized by the title company to make the determination as to what procedures or instruments will suffice to clear the clouds on the title and to actually issue the company's title policy.

In view of the foregoing practice it has become customary for realtors or lenders to place all or portions of the buyer's purchase price money in the hands of the title insurance company's local agent with oral or written instructions to disburse the same for payment of mortgage liens, taxes, etc., only at such time as the authorized employees determine that clouds on the title have been cleared, the buyer is in title and the title company is prepared to issue its title policy.

It is the contention of Chicago Title and Guarantee that title insurance companies and their local agents, while holding the buyer's money as aforesaid, having no direct relationship with the buyer, can have no duty to the buyer and are therefore not responsible for tort damages to the buyer irrespective of whether the buyer's money is lost to him by reason of the title company's direct violation of its instructions.

For the reasons hereafter assigned and the authorities cited we think the position taken by Chicago Title and Guarantee is untenable.

The rule applied in New Jersey is persuasive in our opinion, and we hold that a corporation organized for the purpose, among others, of examining and guaranteeing titles to real estate and which in all matters relating to conveyancing and searching titles holds itself out to the public, and assumes to discharge the same duties as an individual conveyancer or attorney, has the same responsibilities and its duty to its employer is governed by the prin-

ciples applicable to attorney and client. (*Sandler v. N. J. Realty Title Ins. Co.*, 66 N. J. Super. 597, 169 A. 2d 735 [1961], reversed on other grounds, 36 N. J. 471, 178 A. 2d 1; and *Mezzaluna v. Jersey Mortgage, & c., Co.*, 109 N. J. L. 340, 162 Atl. 743 [1932].) In the two cases just cited the suit was based upon negligent title examination and not upon a title insurance policy. In the instant case, it should be noted, the action against Chicago Title and Guarantee is not based upon a title insurance policy.

In *Mezzaluna v. Jersey Mortgage, & c., Co.*, supra, the defendant, a title guarantee company, was in the business of insuring titles and loaning money on bonds and mortgages from its surplus funds. The plaintiff owned land, upon which he was constructing an apartment house under contract with a general contractor, and applied to the defendant for a construction mortgage loan of $165,000.00. He signed one of the defendant's application blanks "for a guaranteed mortgage loan, secured by a first mortgage" upon the premises he owned. A loan was granted and a fund to that amount set apart to be disbursed in making the proper payments on the building. For the title search and other services in the matter, plaintiff agreed to pay a fee of four and one-half per cent, which was deducted from the loan. Defendant *negligently* overlooked a defect in the filing of the building contract, whereby plaintiff was obliged to pay out a large amount of money to satisfy certain mechanics' liens. The trial court found the defendant was *negligent* in not placing a first mortgage upon the property, and held as a matter of law:

" 'A corporation organized, among other things, for the purpose of loaning its surplus funds upon bonds, secured by mortgages and examining the titles thereto and charging a fee for so doing, assumes to discharge the same duties as an individual conveyancer or attorney and is subject to the same responsibilities. Those responsibilities are set forth in *Jacobsen v. Peterson*, 91 N. J. L. 404. In 1 *Joyce on Insurance*, § 309-a, we find the followings:

" ' "A corporation organized for the purpose, among others, of examining and guaranteeing titles to real estate and which in all matters relating to conveyancing and searching titles holds itself out to the public and assumes to discharge the same duties as an individual conveyancer or attorney, has the same responsibilities and its duty to its employer is governed by the principles applicable to attorney and client." ' " (pp. 343, 344.)

The Court of Errors and Appeals approved the trial court's statement of the law and said in its opinion:

"Apart from the fact that there was a somewhat lengthy document signed by plaintiff as an application for the 'guaranteed mortgage loan,' and contain-

ing answers to numerous questions about the property and title, the transaction does not differ in substance from the ordinary construction loan made by a lawyer for a client with funds belonging to that client. It is common knowledge that owners contemplating the erection of a building with borrowed money will defer application for a mortgage loan in order to save interest and until the contract is on file and the building under way. The loan being granted and title approved and mortgage executed and placed upon record, the proceeds of that mortgage become the property of the borrower, subject usually to the fees and expenses of the lender's lawyer for searching the title, &c.; and those proceeds the lawyer disburses as the agent, not only of his client who is lending the money and is entitled to such mortgage lien as contracted for, but also as the agent of the borrower, who has borrowed for a well-understood object, viz., to clear existing liens, and pay for his new building in such manner as to be protected against other liens not of his own making. In this phase of the matter, the borrower stands as though he had drawn the contract price out of his own balance at the bank and placed it in the custody of the lawyer to disburse to parties legally entitled thereto, and in connection with that duty to make sure that the property is protected against mechanics' liens. In other words, the lawyer, or as in this case the lender acting also as lawyer or title searcher, places the amount of the loan to the credit of the borrower, and is under the obligation to disburse it for the borrower's benefit in paying for the new building. Taking the borrower's fee for so doing, he becomes responsible for due care in that process of disbursement." (pp. 345, 346.)

In *Sandler v. N. J. Realty Title Ins. Co.*, supra, the plaintiff sought to recover under the second count for negligence of the defendant in making the title search which failed to reveal the defect in title. The examination and report on the title was said to be a transaction separate from the guarantee of title and that a separate charge was made therefore. *Mezzaluna* was cited and the rule there announced applied.

Where a title insurer presents *a buyer* with both a preliminary title report and a policy of title insurance two distinct responsibilities are assumed; in rendering the first service, the insurer serves as an abstractor of title and must list all matters of public record regarding the subject property in its preliminary report. When a title insurer breaches its duty to abstract title accurately it may be liable in tort for all the damages proximately caused by such breach. (*Jarchow v. Transamerica Title Ins. Co.*, 48 Cal. App. 3d 917, 122 Cal. Rptr. 470 [1975]; and *Hillock v. Idaho Etc. Trust Co.*, 22 Idaho 440, 126 Pac. 612, 42 L. R. A. N. S. 178 [1912].) Punitive damages are a portion of such tort liability. (*Moe v. Transamerica Title Ins. Co.*, 21 Cal. App. 3d 289, 305, 98 Cal. Rptr. 547.) A few courts have held that when an abstractor errs in making or cer-

tifying an abstract of title, the negligent failure of the abstractor was a tort as well as a breach of contract, and the plaintff has the right to select which form of action he would pursue. (*Chicago, R. I. & G. Ry. Co. v. Duncan*, 273 S. W. 908 [Tex. Civ. App. 1925]; *Viotti v. Giomi*, 230 Cal. App. 2d 730, 41 Cal. Rptr. 345 [1964]; and *Williams v. Polgar*, 391 Mich. 6, 215 N. W. 2d 149 [1974].)

In *Williams v. Polgar*, supra, the court held third parties within a clearly foreseeable potential class of injured persons would have a cause of action in negligent misrepresentation against an abstractor for failure to. perform abstracting services in a diligent and reasonably skillful, workmanlike manner. (The case discusses both the requirements of privity of an abstractor and the tort and contractual liability of an abstractor and the appendixes set out the law of all fifty states.)

Under statutory law in Kansas regulating abstracting the abstractor and his sureties are liable on the abstractor's bond for all negligent errors and omissions in an abstract, not only to the person who employed the abstractor, but also to all persons who purchase or invest in land relying on an abstract furnished for that purpose. (*Arnold & Co. v. Barner*, 91 Kan. 768, 771, 139 Pac. 404; and K. S. A. 58-2802, as amended.) On the facts in this case we are not called upon to determine whether the question of privity is resolved by the foregoing statute as to a title insurance company that makes a title search and report. Unfortunately statutes pertaining to title insurance companies do not touch upon the subject. (See, K S. A. 1975 Supp. 74-3901, *et seq.*; K. S. A. 74-4201, *et seq.*; K. S. A. 40-201, *et seq.*; K. S. A. 40-234b; 40-1102[1] [*e*]; and 40-1107a.)

On the issue here presented it is unnecessary to determine the precise time at which Barkyoumb became the agent of the Fords. It is clear when the Fords paid the balance of the purchase price of $28,000 to Barkyoumb at his office to close the transaction, and Barkyoumb in turn gave the Fords a "closing statement" with an assurance that the money would go into his escrow account until the Fords were delivered a good title, Barkyoumb was then an agent of the Fords in the capacity of an escrow agent. One of the conditions of the escrow was to place title to the property in the Fords prior to a distribution of the funds.

There is a respectable line of authorities in this jurisdiction to the effect that the depositary of an escrow is the agent of both the

parties thereto. (*Davis v. Clark,* 58 Kan. 100, 48 Pac. 563; *Gault v. Hurd,* 103 Kan. 51, 172 Pac. 1011; *Smith v. Griffith,* 105 Kan. 357, 184 Pac. 725; *Southern v. Linville,* 139 Kan. 850, 33 P. 2d 123; and *Southern v. Chase State Bank,* 144 Kan. 472, 477, 61 P. 2d 1340, 107 A. L. R. 944; and see *Moe v. Transamerica Title Ins. Co.,* supra.)

In *Nickell v. Reser,* 143 Kan. 831, 57 P. 2d 101, the court discussed an escrow holder and ratification. The court there recognized *Davis v. Clark,* supra, for the proposition that an escrow holder is the agent of both parties, but it said the statement was true in a limited sense only. (Citing, *Smith v. Griffith,* supra.) In the opinion the court said: "To the extent the term agent is applicable it is a limited agency, with duties and powers limited to the terms of the escrow agreement." (p. 835.) The court acknowledged that the escrow agreement may be in writing or in parol, or part in writing and part in parol. The court in *Nickell* concluded:

". . . It is as well to treat him [the depositary] as just what he is, a third party to whom the principal parties to the contract have entrusted certain authority by the escrow agreement. . . ." (p. 835.)

In *Smith v. Griffith,* supra, the court described the depositary of an escrow and said the depositary is more than the agent of the vendor, but is the agent of both parties. It recognized the use of the term "agent" involved problems, but concluded:

". . . The result is, a depositary is always something more or something less than an ordinary agent, and accuracy permits us to say no more than that the depositary is an intermediary between vendor and vendee, having the specific powers and duties created by the escrow agreement, and no others." (p. 360.)

On the facts presented by the record herein, and the law heretofore cited, while Barkyoumb was the real estate agent of the grantors (the Clays), he was selected by the vendors and vendees as an intermediary between the parties to collect and hold the funds representing the purchase price of the property upon the express condition that the grantees (the Fords) be placed in title to the property prior to a distribution of the funds in accordance with the terms of the contract of sale.

Clothed with this authority, Barkyoumb was an agent for both the vendors and vendees when he engaged the services of Guarantee, through Fogarty who was Guarantee's house counsel, to put the Fords in title to the property.

On the facts in this case Chicago Title Insurance Company, acting through Guarantee Abstract and Title Co., Inc., as agent,

was organized for the purpose of examining and guaranteeing titles to real estate and in all matters relating to conveyancing and searching titles held itself out to the public and assumed to discharge the same duties as an individual conveyancer or attorney. It therefore had the same responsibilities and its duties to the Fords are governed by the principles applicable to attorney and client. It became responsible for due care in the process of disbursing the funds representing the purchase price for the real property in question.

The court disbarred an attorney in *State v. Barrett*, 207 Kan. 178, 483 P. 2d 1106, who while acting as an escrow agent misappropriated the funds. It is established in this jurisdiction that the relationship of an attorney to his client is fiduciary in character, binding the attorney to the highest degree of fidelity and good faith to his client on account of the trust and confidence imposed. (*Yeamans v. James*, 27 Kan. 195; *Haverty v. Haverty*, 35 Kan. 438, 11 Pac. 364; *Cunningham v. Jones*, 37 Kan. 477, 15 Pac. 572; *Holmes v. Culver*, 89 Kan. 698, 133 Pac. 164; *Wigton v. Donnelly*, 122 Kan. 796, 253 Pac. 400; *Yeoman v. Morris*, 135 Kan. 566, 11 P. 2d 683; *Kirwin v. McIntosh*, 153 Kan. 395, 110 P. 2d 735; *Henks v. Panning*, 175 Kan. 424, 264 P. 2d 483; and *Scott, Administrator v. Farrow, Executor*, 192 Kan. 666, 677, 391 P. 2d 47 [Schroeder J., dissenting].)

In *Lindholm v. Nelson*, 125 Kan. 223, 264 Pac. 50, the court held:

"A fiduciary relation does not depend upon some technical relation created by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." (Syl. 3.)

Another case in point is *Miller v. Henderson*, 140 Kan. 46, 33 P. 2d 1098.

Our court has approved the recovery of actual damages as well as punitive damages in actions involving breach of a fiduciary duty. (*Beverly v. McCullick*, 211 Kan. 87, 505 P. 2d 624; and see, *Koch v. Merchants Mutual Bonding Co.*, 211 Kan. 397, 507 P. 2d 189; and 14 Washburn L. J. 466 [1975].)

In the instant case Chicago Title through the actions of Guarantee in issuing the title report had a fiduciary obligation and became expressly committed to the Fords who were named in the title report as purchasers. They accepted $25,746.13 of the Fords' money knowing it was the lion's share of the $28,000.00 purchase price, and they accepted the money with express instructions as to its

disbursal. These title companies were fiduciaries and owed the Fords a duty to handle their money with a high degree of care, a duty to absolutely avoid disbursing the Fords' money to pay off a lien on the property until they were assured the Fords were in good title. Instead they immediately disbursed Fords' money contrary to instructions, contrary to the cardinal rule of title practice and under circumstances which involved a high degree of risk that the Fords' money would be lost to them.

Chicago Title and Guarantee contend there was no competent substantial evidence to prove a case warranting the granting of punitive damages against them. This point is related directly to their objection to Instruction No. 17, which in pertinent part reads:

"Plaintiffs make claim against defendants Barkyoumb, Guarantee Abstract and Title Co., Chicago Title Insurance Company and/or Empire Mortgage and Investment Co. for punitive damages in addition to compensatory damages. The law does not require a specific finding of an intentional and ruthless desire to injure in order to sustain an award of punitive damages. Plaintiffs' burden of proof in this regard is sustained upon a showing that such neglect of duty by the wrongdoer or wrongdoers as evinces a reckless indifference to the rights of others. 'Reckless indifference' under Kansas law lies between negligence on one hand and willful or malicious conduct on the other. It is more than negligence and less than willfulness. If you find a defendant to be guilty of negligence as hereinbefore defined, and if you find a defendant guilty of 'reckless indifference' in handling plaintiff's money, and if you believe that justice and the public good require it, you may, in addition to any damages to which you find plaintiffs entitled, award plaintiffs an amount which will serve to punish that particular defendant and to deter others from the commission of like offenses.

"If you allow punitive damages in this case against said defendants, or any of them, then in assessing such damage you may take into consideration the following items:

"1. The probable and reasonable expense of the litigation including attorneys' fees, any expert witness fees and the inconvenience and time involved in preparing for trial.

"2. Such amount as will deter said defendants, or any of them, from such future conduct.

"3. An amount as shall be an example to others and deter them from such conduct.

"The amount shall not be so small as to be trifling nor so large as to be unjust, but such as candid and dispassionate minds may approve as a punitive example and as a warning to others against a similar lapse of duty. You should separately consider the wealth or lack of wealth of each of said defendants in making any determination of punitive damages against said defendants separately."

After reviewing many Kansas cases on the subject of punitive

damages this court in *Watkins v. Layton*, 182 Kan. 702, 324 P. 2d 130, said:

"We think it clear that the law does not require a specific finding of an intentional and ruthless desire to injure in order to sustain an award of punitive damages. The burden of proof is sustained, once the injured party shows such gross neglect of duty as to evince a reckless indifference of the rights of others on the part of the wrongdoer. . . ." (p. 708.)

The trial court by Instruction No. 17, aside from rhetoric, adequately instructed the jury in accordance with the law set forth in *Watkins v. Layton*, supra, and then proceeded to define "reckless indifference." This definition was taken from *Newman v. Nelson*, 350 F. 2d 602, 604, decided on Kansas law in the Tenth Circuit Court of Appeals. It cannot be said the trial court's definition of "reckless indifference" is erroneous.

The objection of Chicago Title and Guarantee as to the law stated in Instruction No. 17 is founded upon *Bailey v. Resner*, 168 Kan. 439, 214 P. 2d 323, where the court said:

". . . [A] wanton act is something more than ordinary negligence, and yet it is something less than willful injury; to constitute wantonness, the act must indicate a realization of the imminence of danger and a reckless disregard and complete indifference and unconcern for the probable consequences of the wrongful act. It might be said to include a willful, purposeful, intentional act, but not necessarily so; it is sufficient if it indicates a reckless disregard for the rights of others with a total indifference to the consequences, although a catastrophe might be the natural result." (p. 442.)

From the foregoing it is argued before an act may be considered *wanton* it must contain two separate elements, namely (1) a conscious realization of the imminence of danger and (2) a reckless disregard and complete indifference and unconcern for the probable consequences thereof. As applied to Instruction No. 17, the argument on the foregoing quote fails to give sufficient consideration to the last clause thereof and the law set forth in *Watkins v. Layton*, supra.

We find Instruction No. 17 given by the trial court adequately informed the jury upon what basis punitive damages could be awarded. It is the only instruction in the record to which an objection was lodged by Guarantee and Chicago Title prior to the giving of the instructions to the jury.

While there is very little conflict in the evidence, on the facts as heretofore related, the prevailing parties in the trial court are entitled to have it viewed in the light most favorable to them. It would serve no purpose to review the evidence again to advance

the tort theory upon which the Fords sought recovery against Guarantee and Chicago Title. Suffice it to say the trial court fully instructed on negligence without objection. In our opinion the evidence established that Chicago Title, acting through its agent Guarantee, acted not only negligently but with such gross neglect of duty as to evince a reckless indifference to the property rights of the Fords. Accordingly, the trial court did not err in overruling their motions for a directed verdict notwithstanding the jury verdict, or in the alternative for a new trial.

Chicago Title and Guarantee argue that the disbursement of a buyer's money to pay off a mortgage lien, prior to being assured that the buyer is in good title, cannot be reckless conduct because it is common practice for title people to disburse the buyer's money to a mortgagee on the expectation of receiving the mortgage release at a later date.

The Kansas Real Property Law on the release of a mortgage is covered by K. S. A. 1975 Supp. 58-2309a. In view of the penalty, attorneys fees and damages available under this statute for the refusal of a mortgagee to cause satisfaction of a mortgage to be entered of record forthwith upon payment there is actually no risk involved in paying off a mortgage lien prior to receiving the written release of the same. When this is contrasted with action taken by Mr. Zimmerman in this case in paying out the buyer's money with only the hope or expectation of obtaining a subsequent deed which puts the buyers in title, the spurious nature of the argument becomes apparent. If the deed is not forthcoming the buyer is faced with a difficult and ofttimes questionable and certainly expensive lawsuit for specific performance. If the seller's title is bad no court can create a good title in the seller. Therefore, it is extremely risky to pay out the buyer's money or in any way jeopardize the buyer's position before being assured that the buyer is in title. Furthermore, Mr. Zimmerman had no assurance that he would get a deed from the Clays. No title search had been made under the names of the Clays to determine whether or not there would be additional clouds on title. It is readily apparent from the record Mr. Zimmerman knew the Clays were the sellers, even though their names were not mentioned on the preliminary title report, because Mr. Zimmerman in talking with Mr. Jordan of Empire directed Mr. Jordan to the Clays' file, which Mr. Jordan was unable to locate.

In our opinion the evidence in this case warranted a substantial award of punitive damages. The evidence disclosed Chicago Title to have a net worth in excess of $31 million, and Guarantee to have a net worth in excess of $336 thousand. The continued refusal of these substantial companies to issue a title policy or return the Fords' money, after *admittedly* disbursing the same in violation of their fiduciary instructions, and in violation of the cardinal rule of title practice, was, to say the least, such gross neglect of duty as to evince a reckless indifference of the rights of the Fords, which deprived them of any opportunity to buy and live out their remaining time in a modest retirement home.

Guarantee and Chicago Title contend it was error to overrule their motion for a directed verdict when the trial court found there was no conversion by them, and that this was the only grounds upon which the Fords based their cause of action against them.

While it is true the trial court indicated during the trial that the Fords' evidence did not establish a conversion, this does not alter the allegations of the amended petition as modified by the pretrial order and the instructions upon which the case was submitted to the jury. In substance the charge is that the amended petition fails to allege any acts of negligence by the title companies. This contention lacks merit. The amended petition contains the following factual allegations of negligence among others:

"5. On April 24, 1972, defendants Barkyoumb used $25,746.13 of plaintiffs' aforesaid money to purchase a cashier's check payable to defendant Empire and on said day caused said cashier's check to be delivered into the possession and control of defendant Chicago Title and defendant Guarantee, acting both individually and as the Kansas City division and agent of defendant Chicago Title. That defendant Chicago Title and defendant Guarantee received plaintiffs' money as fiduciaries with instructions as to its disbursement. Thereafter on said date defendant Chicago Title and defendant Guarantee caused plaintiffs' money to be put out of its possession and control in a manner contrary to the disbursement instructions by causing same to be delivered into the possession and control of defendant Empire. . . .

"6. At all times subsequent to April 14, 1972, defendants Barkyoumb, Chicago Title, Guarantee, Empire and Slavens were fully advised and aware of numerous and various title defects in the above-described property which had not been corrected and satisfied and said defendants and each of them should not have allowed plaintiffs' money to be delivered out of their respective possession and control for any purpose and particularly for the purpose of paying off a lien against the above-described property until such time as said defendants and each of them was assured of the existence of and had

possession of and/or was absolutely assured of the availability of a warranty deed and owner's title policy to the plaintiffs as hereinbefore described.   .   .   .

\* \* \* \* \*

"8. By reason of the aforesaid the plaintiffs have suffered grievous consequential damages and although demand has been made on the defendants and each of them, plaintiffs' monies have not been returned nor have plaintiffs received a warranty deed and owner's title policy as aforesaid."

While it is true that the Fords contended in their amended petition as modified at pretrial that the above acts of negligence constituted a conversion, this is not fatal to their lawsuit. The trial court was hung up on a belief that conversion of money would not lie unless a party so charged retained the money and was thereby profited. This court has held a defendant bank to be guilty of conversion when it disbursed the plaintiffs' money contrary to express instructions. (*Drumm-Standish Com. Co. v. Farmers State Bank*, 132 Kan. 736, 297 Pac. 725.)

Actually, the conversion argument is insignificant. The specified wrongful act set forth in the Fords' amended petition, as it was again amended at the pretrial, remained the same whether the conclusion to be drawn from them was designated to constitute a conversion or some form of negligence.

The Fords' pleadings as amended at pretrial were summarized by the trial court in its instructions to the jury without objection. Among the allegations in the summary it was said Chicago Title and Guarantee had "acted with gross neglect of duty so as to evince a reckless indifference to the rights of the plaintiffs resulting in conversion of plaintiffs' money." Instruction No. 17 indicates the evidence to support the alleged wrongful acts of Chicago Title and Guarantee was submitted to the jury to determine whether they acted with such neglect of duty as to evince a reckless indifference to the property rights of the Fords. The verdict of the jury resolved this issue.

Chicago Title and Guarantee contend it was error to permit the Fords' expert witness, M. E. Chadborn, to testify that their conduct was a reckless disregard of the property rights of the plaintiffs when this was the ultimate issue to be tried by the jury, and that there was no competent evidence on which to base such an opinion.

Mr. Chadborn was a local title insurance man with a life-long work and experience in abstract and title matters as heretofore related. The testimony of an expert witness on this point is controlled by K. S. A. 60-456 (*d*). It provides:

"Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

Notwithstanding the foregoing statute, Chicago Title and Guarantee contend that Chadborn should not have been permitted to give his opinion as to the ultimate issue to be decided by the jury, because title work and procedures are not of sufficient complexity and beyond the common knowledge and experience of the ordinary person so as to aid the jury in the interpretation of facts or assist the jury in understanding the material evidence to determine whether or not the work and procedures were done properly. The three automobile cases relied upon, *Frase v. Henry*, 444 F. 2d 1228 (10th Cir. 1971); *Ziegler v. Crofoot*, 213 Kan. 480, 516 P. 2d 954; and *Massoni v. State Highway Commission*, 214 Kan. 844, 522 P. 2d 973, are not persuasive in the instant case. The work of a real estate title man is extremely complicated and technical in the sense that he must have a complete and detailed background and understanding in all phases of real property law and security transactions, he must be skilled in the myriad of procedural and substantive requirements of all of the various types of court proceedings which effect or cause the transfer of real property titles, he is required to understand and know the legal effect of all of the various instruments, which effect or transfer real property titles or any interest therein, and he is required to know the subtle timing required so as to guide the various steps involved in a real property sale closing and place them in their proper order so as to safeguard the interest of all parties involved. This is beyond the common experience and knowledge of the ordinary person who would have no realistic impression as to what acts are in fact title work errors, and as to the seriousness of a particular type of title work error.

Under the circumstances the expert testimony of Mr. Chadborn was properly admitted in evidence and the jury was properly instructed that they could either accept or reject the expert testimony or give it such weight as they deemed proper. There was evidence in the record to support his opinion testimony.

Chicago Title contends it was error for the trial court to overrule its motion for a directed verdict because there was no clear and convincing evidence as to the agency relationship between Chicago Title and Guarantee, and further that there was no showing that its alleged agent was acting within the scope of its agency at the times complained of by the Fords. (Citing *Rodgers v. Arapahoe*

*Pipe Line Co.,* 185 Kan. 424, 345 P. 2d 702; *Hughes v. Jones,* 206 Kan. 82, 476 P. 2d 588; and *Jacobson v. Parrill,* 186 Kan. 467, 351 P. 2d 194.)

On the record before this court the foregoing point is controlled by *Greep v. Bruns,* 160 Kan. 48, 55-56, 159 P. 2d 803, where the court approved the following rule:

" 'The liability of the principal for the acts and contracts of his agent is not limited to such acts and contracts of the agent as are expressly authorized, necessarily implied from express authority, or otherwise actually conferred by implication from the acts and conduct of the principal. All such acts and contracts of the agent as are within the apparent scope of the authority conferred on him, although no actual authority to do such acts or to make such contracts has been conferred, are also binding upon the principal. Apparent authority, or ostensible authority, as it is also called, is that which, though not actually granted, the principal knowingly permits the agent to exercise, or which he holds him out as possessing. Accordingly, as defined by the American Law Institute, an apparent agent is one who, with or without authority, reasonably appears to third persons to be authorized to act as the agent of another.' "

Subsequent cases in which the foregoing rule has been discussed with approval are cited in *Brown v. Wichita State University,* 217 Kan. 279, 286, 540 P. 2d 66, aff'd. in part, 219 Kan. 2, 547 P. 2d 1015.

The title report issued to the Fords by Chicago Title contained the following language: ·

"CHICAGO TITLE INSURANCE COMPANY
KANSAS CITY DIVISION
❉   ❉   ❉   ❉   ❉
TITLE REPORT
"NOTE: Direct all inquiries relating to this report to the issuing agent:
GUARANTEE ABSTRACT & TITLE CO., INC.
727 Ann Avenue
Kansas City, Kansas 66101
(913) 321-0324
Mr. Roy Barkyoumb, Realtor,
1421 North 38th,
Kansas City, Kansas 66102
Purchasers: Wayne L. Ford
Margaret Ford"

The application form which Guarantee regularly used to initiate the proceedings preliminary to the issuance of a Chicago Title Insurance Company title insurance policy contained the following:

"APPLICATION FOR TITLE INSURANCE
TO
CHICAGO TITLE INSURANCE COMPANY"

The evidence disclosed that Guarantee as a local agent and a division of Chicago Title prepared and issued Chicago Title Insurance Company's title insurance policies but did not prepare and issue policies for any other company. From the admissions of Mr. Zimmerman, as vice-president of Guarantee, and the testimony of Mr. Chadborn, the expert witness, the evidence disclosed that from the time Guarantee took an order for a title insurance policy and filled in the application form it was acting as the agent of Chicago Title. When one calls the local agent of a title insurance company to order a title insurance policy, the agent fills out an application form and runs a title search on the property for the purpose of preparing a title report, and thereafter when the exceptions, if any, have been cleared the title policy is issued. All of these steps are preliminary to the purchase of a title policy. Guarantee was admittedly the authorized agent of Chicago Title to issue its title policies.

There was no contrary evidence before the jury on the agency question. The jury could hardly have found that Guarantee was not acting as the agent of Chicago Title at the time it disbursed the Fords' money.

The Clays appeal from the order distributing funds from the sale of the premises in question to the Fords, contending that the trial court erred as a matter of law and as a matter of equity.

After the Fords filed suit in May of 1972 all defendants filed responsive pleadings. The Clays in their cross-petition against the other defendants alleged that Barkyoumb was acting as their real estate agent and therefore claimed entitlement to the net proceeds of the sale of the property.

On the facts heretofore related it should be noted that on the same day Empire received the cashier's check from Mr. Zimmerman of Guarantee, in the precise amount indicated by the payoff letter from Empire, the funds were used by Empire to pay the Slavens' note and mortgage which had been assigned to the Wornall Bank. Empire in turn obtained a release of that mortgage. It is uncontroverted that it was $25,746.13 of the Fords' money that was used to secure the release of the Slavens' note and mortgage, which was a first and prior lien of record against the property in question.

While this lawsuit was pending in December of 1973 *all parties to the litigation, including the Clays,* moved the court for an order to assume jurisdiction over the property in question, to sell the

same and to distribute the proceeds as indicated by the equities of the parties. Subsequent journal entries were required to clear the clouds on title and get title into the Clays to effectuate a sale of the property. The net proceeds from the sale of this property were $22,886.86. These funds were paid into the clerk of the district court on June 10, 1974, which was in fact the opening day of the trial of this case before the jury. The fact of the sale of this property and the proceeds therefrom was not made known to the jury during the trial, and the distribution thereof in accordance with the demonstrated equities of the parties was left solely up to the trial court in accordance with the motions of all parties and the journal entry of December 18, 1973.

Evidence during the trial with regard to the now alleged equity of the Clays in the net proceeds of the sale was as follows:

In response to questions by counsel for the Clays an expert real estate broker testified that where the purchase price of the property was $28,000.00 as here, and commission to be paid on the sale by the Clays would be $1,960.00, with a mortgage lien against the property of $25,746.13, and the sellers responsible for a title insurance policy at an approximate premium of $200.00, the balance of the sale price available to the sellers in the transaction would be $93.87. The witness further acknowledged that there would probably be additional closing costs to be paid by the sellers. The Clays' counsel in questioning Mrs. Clay established that she was aware Mr. Barkyoumb was going to take the real estate commission out of the purchase price. Thereafter he asked Mrs. Clay the following question, which she answered:

"QUESTION: You have been here throughout. You have heard the disbursements of money that have been made, and from all apparent calculations, is it a fair statement to say that after this entire transaction has been concluded by the other defendants that, rather than having any equity, you probably owe money as a result of the sale of that home?

"ANSWER: Yes sir."

In his final argument the Clays' attorney suggested to the jury that the Clays rather than having an equity in the property in question would probably be in the hole by approximately $203.00 under the terms of the sale.

The Clays' argument is basically founded upon two facts. First, on June 7, 1974, the trial court in hearing the equitable matter submitted to it ordered that the mortgage of $24,700.00 from Clays made payable to Empire, and the mortgage instrument of October

25, 1971, executed by the Clays to Empire for the same amount regarding said property:

". . . [S]hall be and hereby is declared null and void and shall not be a debt of said defendants Jessie H. Clay, Jessie H. Clay, Jr. or Constance G. Clay nor a lien upon their property but is being fully paid and discharged as to all persons, firm or corporation whatsoever."

On the same day, June 7, 1974, the trial court ordered the Clays to execute a warranty deed in favor of the purchasers (Jackson & Scherer, Inc.).

The second fact relied upon by the Clays is that on June 21, 1974, on trial to a jury, the jury returned a verdict in favor of the defendants Clay and against plaintiffs Ford in the Fords' contract action against the Clays.

Thereafter on July 9, 1974, the Clays filed a motion for distribution of funds held in the office of the clerk of the district court claiming fee title to the property on the ground that the Fords proceeded against them in contract, and the defendants Clay were held not liable in contract as shown by the jury verdict. The Clays alleged in their motion that the action by the Fords against the other defendants, Barkyoumb, Guarantee, Chicago Title and Empire were all in tort, not in contract, and none of the defendants were ever fee titleholders, but were wrongful and tortious actors and were in reckless disregard of the rights of the Clays in the light of the findings of the court on June 21, 1974. The Clays argued the other defendants have no standing on which to claim an offset on a verdict against them in tort and punitive damages, and that it would be compounding the wrongful act by utilizing funds upon receipt from a contract sale of property from defendants Clay to other persons not parties to this litigation.

On August 22, 1974, the trial court by letter to counsel overruled the Clays' motion for distribution of funds held by the district court to them and sustained the motion of the Fords, filed June 25, 1974, for distribution of the funds from the sale of the real estate. The trial court's letter of August 22, 1974, ruled:

"The motion of the plaintiffs that a distribution of the amount now on deposit in the Clerk of the District Court's office will be sustained, and all funds will be paid over to the counsel for the plaintiffs, less court costs. The Clerk is directed to credit the account of the defendants Barkyoumb, Guarantee Abstract and Title, Chicago Title and Trust Company and Empire Mortgage and Investment Company with an amount equal to one-fourth of the amount distributed to the plaintiffs."

The fallacy in the Clays' argument is that they seek to commingle the benefits of two proceedings to establish their entitlement to a windfall by ignoring facts established in these proceedings undesirable to them. Here the Clays joined with all parties to the litigation to have the court take jurisdiction of an equitable proceeding for the purpose of selling the property and converting it into a liquid asset. In this equitable proceeding the Clays' unrecorded mortgage to Empire, originally designed to raise funds to pay off the Slavens' construction mortgage on the property, was set aside because Empire failed to use the funds for that purpose and permitted the Slavens' mortgage to stand as a first lien on the property. Since the Ford's money was used to pay off the Slavens' mortgage, the trial court, sitting as a court of equity, found that the Fords had an equity in the property, or any proceeds from the sale thereof, in the amount of $25,746.13. The net proceeds from the sale of the property were $22,886.86, and it is readily apparent the established equity of the Fords exceeded the net sale proceeds by approximately $3,000.00.

When the trial court distributed the net proceeds of the sale to the Fords it did not announce the equitable principle by which this action was taken.

The Clays seize upon the fact these funds credited to the Fords were indirectly used to benefit the tort defendants in the civil action. The Clays contend these tort defendants do not come into a court of equity with clean hands and are therefore entitled to no relief. By this process of reasoning the Clays claim they are entitled to a windfall. Novel theories are advanced by the Clays in their brief, but we find no merit in them.

Counsel for the Fords suggests several theories upon which the action of the trial court can be sustained on equitable principles: Restitution (*Holloway v. Water Co.*, 100 Kan. 414, 424, 167 Pac. 265, 2 A. L. R. 161); unjust enrichment (*Anderson v. Anderson*, 155 Kan. 69, 72, 123 P. 2d 315); legal subrogation (*United States Fidelity & Guaranty Co. v. Maryland Cas. Co.*, 186 Kan. 637, 352 P. 2d 70); and equitable lien (*Hill v. Hill*, 185 Kan. 389, 345 P. 2d 1015).

We shall not undertake to discuss all of these equitable theories. Clearly the equitable lien theory is applicable. In *Hill v. Hill*, supra, the court said:

"An equitable lien is not a right of property in the subject matter of the lien nor a right of action therefor, nor does it depend upon possession; but is

merely a right to have the property subjected to the payment of a debt or claim, and it applies as well to charges arising by express engagement of the owner of property as to a duty or intention implied on his part to make the property answerable for a specific debt or engagement." (Syl. 5.)

There is no substance to the Clays' argument that their property was taken without due process. The Clays, along with other parties to the civil litigation, moved the court to take jurisdiction of the property for the purpose of causing it to be sold, and to thereafter distribute the proceeds as the equities of the parties should be established. No property was ever taken from the Clays; they voluntarily placed their interest, if any, in the court and thereafter failed to prove they had any equity in such property.

The court, in its process of causing the property to be sold, established the Clays as the record fee titleholders by causing a copy of the Slavens-to-Clays deed to be recorded. This action was merely a method of clearing the title and establishing a chain of title so that the Clays could effectively convey to the purchasers the property which the court had ordered sold. The procedure was one of convenience, and it established no property right or equity interest in the Clays. It follows that the order of distribution made by the trial court concerning the net proceeds of the sale was not erroneous and must be sustained.

In their cross-appeal the Fords contend the trial court erred in that portion of its post-trial order of October 7, 1974, wherein it altered the jury verdict by reducing the punitive damage awards against Guarantee and Chicago Title without the consent of the prevailing party.

At the pretrail hearing of the case in December of 1973, the trial court, with discretion to then allow or deny, permitted the Fords to amend their petition so as to state separate causes of action for punitive damages against the tort defendants, and to increase their prayer for punitive damages to $50,000 against the defendant Guarantee and $100,000 against the defendant Chicago Title. At this juncture the amounts of punitive damages prayed for did not shock the court or it could have disallowed the requested amendment.

On June 21, 1974, at the conclusion of a two-week trial, the jury returned its verdict awarding plaintiffs compensatory damages against the tort defendants and punitive damages of $35,000 against the defendant Guarantee and $70,000 against the defendant Chicago Title. These awards were substantially less than the punitive damages prayed for by the plaintiffs.

On June 26, 1974, the trial court expressly confirmed the jury's verdict and awards by signing and filing its journal entry. At this juncture the trial judge had heard all of the evidence in the case, had listened to the lengthy arguments of the numerous lawyers involved, both within and without the presence of the jury, and had contemplated the matter for five days subsequent to the verdict.

His conscience was not then shocked by the amount of the punitive damage awards or he would not have approved and confirmed the same by signing and filing the journal entry of judgment.

On July 1, 1974, Chicago Title and Guarantee filed their respective motions and other post-trial matters and motions. In the court's letter of August 22, 1974, the trial judge indicated that he was overruling certain motions, including Guarantee's and Chicago Title's motions for directed verdicts and/or new trial, that he was reducing the punitive damages against Guarantee to $25,000 and against Chicago Title to $25,000 as the punitive damage awards by the jury were so excessive as to shock the conscience of the court. These reductions were made without the consent or approval of the Fords and without ever extending to them the option to either accept the reduction or have a new trial.

It is apparent from the record the trial court was influenced by matters outside the record to reduce the punitive damages awarded against Guarantee and Chicago Title.

In arguing the post-trial motions on August 2, 1974, counsel then representing Guarantee and Chicago Title suggested to the trial court that Chicago Title, as the principal, would be entitled to complete indemnification from its agent Guarantee of all damages awarded by the jury. The record then discloses inquiry by the court as follows:

"THE COURT: There's a question I would like you to answer, if you would, please. *It's very important to me in consideration of the eventual disposition in this case,* either on your theory of indemnification of a principal against an agent or by any present existing agreement between your client and Guarantee, assuming there would be no further action in this case and this judgment would stand as far as the judgment against your client is concerned, *to what extent would Guarantee be looked to to satisfy that judgment?"* (Emphasis added.)

When the attorney responded he was not in possession of any such document, the court requested that he obtain the same for the court, and the attorney agreed to do so. All of this was over the objection of Fords' attorneys who pointed out: (1) That if Chicago Title had any claim for indemnification against Guarantee it could

and should have asserted the same by cross-claim but had not done so; (2) that the court's request for information outside the trial record was prejudicial and improper; (3) that any dispute between the judgment defendants as to who would be required to pay the plaintiffs' judgment would have to be the subject matter of a separate lawsuit; and (4) that it was highly improper for the court to consider any of those matters in making any decision in the case.

The record does not disclose that the requested agency contract was produced, but from the foregoing the Fords are entitled to a presumption that the trial judge became so obsessed with the thought that Guarantee might have to pay the punitive damages assessed against Chicago Title that he then made an about-face and reduced the punitive damages by describing the jury's award of punitive damages as shocking his conscience.

The trial court's journey outside the record probably resulted in a misconception of an attempt to contract away punitive responsibilities, which are generally held to be violative of public policy. (See, *Koch v. Merchants Mutual Bonding Co.*, supra.)

It is no concern of the trial judge as to how or by whom a judgment will be paid. The court is not privileged to go beyond the issues in the case and make any determination whatsoever on matters outside of those issues. (*In re Estate of Grove*, 158 Kan. 444, 451, 148 P. 2d 497; and see, *Agee v. Kansas Highway Commission*, 198 Kan. 173, 422 P. 2d 949.)

Irrespective of whether or not the trial judge's improper journey outside the record caused his about-face, he was without authority to deny the Fords their consitutional right to a jury determination of fact issues by his reduction of the jury's verdict without their consent.

Prior to 1964 in cases tried by a jury the court, with the consent of the prevailing party, could reduce the verdict by such part as was not warranted by the evidence and render judgment for the residue, or grant a new trial when justice required it pursuant to G. S. 1949, 60-3004. Cases decided under that statute held a trial court was without authority to reduce a verdict for the plaintiff without the plaintiff's consent. (*McAlister v. McNown*, 174 Kan. 608, 258 P. 2d 309.)

In our new Code of Civil Procedure, effective January 1, 1964, there is no corresponding statute expressly granting the authority of remittitur to the Kansas courts.

The authorities unanimously hold that a court, whether trial or appellate, is powerless to reduce the verdict of the jury in an action for unliquidated damages and render judgment for a less amount, unless the party in whose favor the verdict was rendered consents to the reduction, since a reduction under such circumstances invades the province of the jury, and violates the Seventh Amendment right to jury trial under the United States Constitution. The proper course, if a remittitur is refused, is to set aside the verdict and grant a new trial. (Annot., 53 A. L. R. 779 [1928]; *Kennon v. Gilmer*, 131 U. S. 22, 33 L. Ed. 110, 9 S. Ct. 696; *Dimick v. Schiedt*, 293 U. S. 474, 79 L. Ed. 603, 55 S. Ct. 296; and Annot., 95 A. L. R. 1163 [1935].) Language to the contrary in *Rooks v. Brunch*, 202 Kan. 441, 449 P. 2d 580 and *Madison v. Wichita, Sedgwick County Health Dept.*, 213 Kan. 736, 518 P. 2d 935 is disapproved.

This is the law today. It was recently stated by the Sixth Circuit Court of Appeals in *Brewer v. Uniroyal, Inc.*, 498 F. 2d 973 (1974) that:

". . . [T]he District Court must offer the party awarded damages the choice of a new trial or the amount of the Court's remittitur. Dimick v. Schiedt, 293 U. S. 474, 476, 55 S. Ct. 296, 79 L. Ed. 603 (1935); Kennon v. Gilmer, 131 U. S. 22, 29, 9 S. Ct. 696, 33 L. Ed. 110 (1889); Manning v. Altec, Inc., 488 F. 2d 127, 130 (6th Cir. 1973). The District Court cannot, without the consent of the parties, substitute its judgment for that of the jury on the issue of just compensation. United States v. 93.970 Acres of Land, 258 F. 2d 17, 31 (7th Cir. 1958), rev'd on other grounds, 360 U. S. 328, 79 S. Ct. 1193, 3 L. Ed. 2d 1275 (1959). To permit the Court to do so would erode the parties' Seventh Amendment guarantee of a jury trial." (p. 976.)

(See also, *Burnett v. Coleman Company*, 507 F. 2d 726 727 [6th Cir. 1974].)

The Kansas cases which have dealt with the subject of remittitur have confined the discussion to our former statutory language, not constitutional guarantees. (See, *McAlister v. McNown*, supra; *Ellis v. Kansas City Public Service Co.*, 131 Kan. 555, 292 Pac. 939; and *Leinbach v. Pickwick Greyhound Lines*, 135 Kan. 40, 10 P. 2d 33.)

Since the trial court refused to grant a new trial on the motions of the various defendants, and did not extend to the prevailing parties any such alternative, it must be concluded the trial court did not find the jury's verdict to be the result of passion and prejudice, in which event it would have been compelled to grant a new trial. It is apparent the trial court did not intend to grant a new trial for any of the reasons stated in K. S. A. 1975 Supp. 60-259 (*a*). (See, *Herbel v. Endres*, 202 Kan. 733, 451 P. 2d 184.)

Accordingly, we hold the trial court erred in reducing the punitive damage awards against Guarantee and Chicago Title. The judgment entered by the trial court on the jury's verdict in accordance with its journal entry filed June 26, 1974, is reinstated against Guarantee and Chicago Title. (No appeal was taken by Barkyoumb or Empire.)

Considering all of the facts and circumstances presented by the record herein, we conclude the verdict of punitive damages against Chicago Title in the sum of $70,000, and against Guarantee in the sum of $35,000 was too large by 50% and should be reduced by that amount. Accordingly, the judgment for punitive damages against Chicago Title is reduced from $70,000 to $35,000, and the judgment for punitive damages against Guarantee is reduced from $35,000 to $17,500 upon the condition that the Fords accept the reduced amount of punitive damages in writing within ten days after this decision becomes final, by filing their acceptance with the clerk of the district court, or, upon their failure to accept the remittitur within the time allotted, the Fords are granted a new trial on the issue of punitive damages against the appellants Chicago Title and Guarantee.

Accordingly, the judgment of the lower court rendered on June 21, 1974, (filed June 26, 1974) is affirmed as modified; and the order of the lower court distributing the net proceeds from the sale of the property in question to the Fords and crediting the account of each of the tort defendants, Barkyoumb, Guarantee, Chicago Title and Empire with an amount equal to one-fourth of the amount distributed to the Fords is affirmed.

FROMME, J., not participating.